**GUTRIDE SAFIER LLP**
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
  todd@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GAIL SPEARS and REVITAL YOGEV, individuals, on behalf of themselves, the general public, and those similarly situated,<br><br>               Plaintiffs,<br><br>    v.<br><br>THE CAMPBELL'S COMPANY; WM. BOLTHOUSE FARMS, INC.; GENEROUS BRANDS LLC; and PACIFIC FOODS OF OREGON LLC,<br><br>               Defendants. | CASE NO.<br><br>CLASS ACTION COMPLAINT FOR INVASION OF PRIVACY; INTRUSION UPON SECLUSION; WIRETAPPING IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 631); USE OF A PEN REGISTER IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 638.51); COMMON LAW FRAUD, DECEIT AND/OR MISREPRESENTATION; AND UNJUST ENRICHMENT<br><br>JURY TRIAL DEMANDED |

CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................... 1

THE PARTIES ......................................................................................................... 3

JURISDICTION AND VENUE ................................................................................ 4

SUBSTANTIVE ALLEGATIONS ............................................................................ 5

    A.    Defendants Programmed their Websites to Include Third-Party Resources that Utilize Cookie-Based Tracking Technologies. ............................................. 5

    B.    Defendants Falsely Informed Users That They Could Opt-Out of or Reject All Unnecessary Cookies on the Websites. ........................................................ 23

    C.    The Private Communications Intercepted and Collected Through Third-Party Cookies on Defendants' Websites. ...................................................................... 39

        1.    The Website Causes the Interception of the Contents of Communications. ..................................................................................... 39

        2.    Facebook Cookies (Bolthouse, Rao's and Pacific Foods Websites). ..... 41

        3.    Google Cookies (the Campbell's, Rao's, Pacific Foods, and Michael Angelo's Websites). .......................................................................... 50

        4.    TikTok Cookies (Rao's and Pacific Foods Websites). .......................... 64

        5.    Additional Third-Party Cookies. ........................................................... 75

    D.    The Third Parties Intercept User Communications While in Transit. ............... 80

    E.    The Signaling and Addressing Information Intercepted by the Third Parties. ... 84

    F.    The Private Communications Collected are Valuable. ....................................... 85

PLAINTIFFS' EXPERIENCES ............................................................................. 87

CLASS ALLEGATIONS ........................................................................................ 93

CAUSES OF ACTION ........................................................................................... 95

    First Cause of Action: Invasion of Privacy ...................................................... 95

    Second Cause of Action: Intrusion Upon Seclusion .......................................... 98

    Third Cause of Action: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631) ........................................................ 99

    Fourth Cause of Action: Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51) ............................... 104

    Fifth Cause of Action: Common Law Fraud, Deceit and/or Misrepresentation ........... 106

    Sixth Cause of Action: Unjust Enrichment ...................................................... 108

PRAYER FOR RELIEF ........................................................................................ 110

CLASS ACTION COMPLAINT

Plaintiffs Gail Spears and Revital Yogev (collectively, "Plaintiffs") bring this action on behalf of themselves, the general public, and all others similarly situated against The Campbell's Company, Wm. Bolthouse Farms, Inc., Generous Brands LLC, and Pacific Foods of Oregon LLC (collectively, the "Defendants"). Plaintiffs' allegations against Defendants are based upon information and belief and upon investigation of Plaintiffs' counsel, except for allegations specifically pertaining to Plaintiffs, which are based upon Plaintiffs' personal knowledge.

**INTRODUCTION**

1.      This Class Action Complaint concerns egregious violations of consumer privacy in violation of California law. When consumers visit Defendants' ecommerce websites (including www.campbells.com (the "Campbell's Website"), www.bolthouse.com (the "Bolthouse Website"), www.Rao's.com (the "Rao's Website"), www.pacificfoods.com (the "Pacific Foods Website"), and michaelangelos.com (the "Michael Angelos Website") (collectively, the "Websites"), Defendants display to them popup cookie consent banners, which are different in appearance and form on each Website, but which function similarly and make similar representations. Specifically, each of Defendants' cookie banners disclose that each Website uses cookies but expressly gives users the option to control how they are tracked and how their personal data is used, including the option to reject all cookies other than those necessary for the Website to operate.

2.      For example, the Campbell's Website assured Website users that they do not have to accept cookies; instead they can manage their cookies preferences using the "Your Choices tool" by clicking the "OPTIONS" button:[1]

About Cookies On This Site

We use cookies to personalize and enhance your experience on our site. Visit our **Privacy Policy** to learn more and manage your preferences via our **Your Choices** tool. By using our site, you agree to our use of cookies.

I ACCEPT          OPTIONS

---

[1] The popup cookie consent banner on the Campbell's Website has changed over time but the functionality remains the same. This is the version of the banner that was displayed to Plaintiff Spears when she visited the Campbell's Website.

- 1 -
CLASS ACTION COMPLAINT

3.    As another example, the Bolthouse Website discloses that the Website uses cookies but purportedly enbales consumers to reject all unnecessary cookies by clicking the "Use necessary cookies only" button:[2]

4.    Like most internet websites, Defendants designed the Websites to include resources and programming scripts from third parties that cause those parties to place cookies and other similar tracking technologies on visitors' browsers and devices and/or transmit cookies along with user data. Unlike many websites, however, Defendants affirmatively represented that users could browse the Websites without being tracked, followed, or targeted by third-party data brokers and advertisers. Those representations were false.

5.    Even after users elect to opt-out of or reject the cookies on these Websites, Defendants nonetheless caused multiple third parties—including Meta Platforms, Inc. (Facebook), Google LLC (DoubleClick, Google Analytics, and YouTube), ByteDance Ltd. (TikTok), The Trade Desk, Inc. (adsrvr.org), Amazon.com, Inc. (amazon-adsystem), Yahoo, Inc., Microsoft Corporation (Microsoft Bing), Pinterest, Inc., X Corp (Twitter), and others (the "Third Parties")—to place and/or transmit cookies that track users' website browsing activities and intercept their private communications on the Websites.

6.    Contrary to users' express rejection of cookies and tracking technologies on the Websites, Defendants caused cookies, including the Third Parties' cookies, to be sent to Plaintiffs' and other visitors' browsers, stored on their devices, and transmitted to the Third Parties along with user data. These cookies permitted the Third Parties to track and collect data

---

[2] The popup cookie consent banner on the Bolthouse Website has changed over time but the functionality remains the same. This is the version of the banner that was displayed to Plaintiff Yogev when she visited the Bolthouse Website.

CLASS ACTION COMPLAINT

in real time regarding Websites' visitors' behaviors and communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

7. The Third Parties analyze and aggregate this user data across websites and time for their own purposes and financial gain, including, creating consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; creating audience segments based on shared traits (such as Millennials, Californians, tech enthusiasts, etc.); and performing targeted advertising and marketing analytics. Further, the Third Parties share user data and/or user profiles to unknown parties to further their financial gain.

8. This type of tracking and data sharing is exactly what Website visitors sought to avoid when they clicked or selected the buttons or options to reject or opt-out of cookies on the Websites' cookie consent banners and/or the Your Choices tool on the Campbell's Website. Defendants falsely told the Websites' users that they respected their privacy choices and would refrain from tracking and data sharing when users rejected cookies. Despite receiving clear notice of users' lack of consent, Defendants ignored those choices and violated statues and torts duties owed to Plaintiffs and those similarly situated users of the Websites.

## THE PARTIES

9. Plaintiff Gail Spears is, and was at all relevant times, an individual and resident of Antioch, California. Plaintiff intends to remain in California and makes her permanent home there.

10. Plaintiff Revital Yogev is, and was at all relevant times, an individual and resident of North Hollywood, California. Plaintiff intends to remain in California and makes her permanent home there.

11. Defendant The Campbell's Company ("Campbell's"), formerly known as the Campbell Soup Company, is a New Jersey corporation with its principal place of business in

Camden, New Jersey. Campbell's is the owner and operator of the Campbell's Website, Rao's Website and Michael Angelos Website.

12. Defendant Wm. Bolthouse Farms, Inc. ("Bolthouse") is a Michigan corporation with its principal place of business in Bakersfield, California. Prior to July 1, 2025, Bolthouse was the owner and operator of the Bolthouse Website.

13. Defendant Generous Brands LLC ("Generous Brands") is Delaware limited liability corporation with its principal place of business in Bakersfield, California. On information and belief, effective July 1, 2025, Generous Brands became the owner and operator of the Bolthouse Website.

14. Defendant Pacific Foods of Oregon LLC ("Pacific Foods") is an Oregon limited liability corporation with its principal place of business in Tualatin, Oregon. Pacific Foods is the owner and operator of the Pacific Foods Website.

15. Defendant Campbell's directly or indirectly owns, controls, and operates Defendant Bolthouse and Pacific Foods, including through its acquisition of Sovos Brands Inc. and its ownership of affiliated subsidiaries and business units.

## JURISDICTION AND VENUE

16. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2). The aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and Plaintiffs and at least one Defendant are citizens of different states.

17. The injuries, damages and/or harm upon which this action is based, occurred or arose out of activities engaged in by Defendants within, affecting, and emanating from, the State of California. Defendants regularly conduct and/or solicit business in, engage in other persistent courses of conduct in, and/or derives substantial revenue from products and services provided to persons in the State of California. Defendants have engaged, and continue to engage, in substantial and continuous business practices in the State of California.

18. Further, the Private Communications and data that Defendants cause to be transmitted are routed through servers located in California.

19. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a

CLASS ACTION COMPLAINT

substantial part of the events or omissions giving rise to the claims occurred in the state of California, including within this District.

20.     Plaintiffs accordingly allege that jurisdiction and venue are proper in this Court.

## SUBSTANTIVE ALLEGATIONS

**A.     Defendants Programmed their Websites to Include Third-Party Resources that Utilize Cookie-Based Tracking Technologies.**

21.     Every website, including the Websites, is hosted by a server that sends and receives communications in the form of HTTP requests, such as "GET" or "POST" requests, to and from Internet users' browsers. For example, when a user clicks on a hyperlink on the Websites, the user's browser sends a "GET" request to that Website's server. The GET request tells the Website's server what information is being requested (e.g., the URL of the webpage being requested) and instructs the Website's server to send the information back to the user (e.g., the content of the webpage being requested). When the Website's server receives an HTTP request, it processes that request and sends back an HTTP response. The HTTP request includes the client's IP address, which allows the Website's server to identify the origin of the request and return the response.

22.     An IP address (Internet Protocol address) is a unique numerical label assigned to each device connected to a network that uses the Internet Protocol for communication, typically expressed as four sets of numbers separated by periods (e.g., 192.168.123.132 for IPv4 addresses). IP addresses can identify the network a device is on and the specific device within that network. Public IP addresses used for internet-facing devices reveal geographical locations, such as country, city, or region, through IP geolocation databases.

23.     As a result, Defendants knew or should have known that the devices used by Plaintiffs and Class members to access the Websites were located in California.

24.     Defendants voluntarily integrated "third-party resources" from the Third Parties into their Websites' programming. "Third-party resources" refer to tools, content or services provided by third parties, such as analytics tools, advertising networks, or payment processors, that a website developer utilizes by embedding scripts, styles, media, or application

- 5 -

programming interface (API) into the website's code. Defendants' use of the third-party resources on their Websites is done so pursuant to agreements between Defendants and those Third Parties.

25.    The Websites cause users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website server to a user's web browser and stored locally on the user's device. As described below, cookies generally contain a unique identifier which enables the website to recognize and differentiate individual users. Cookie files are sent back to the website server along with HTTP requests, enabling the website to identify the device making the requests, and to record a session showing how the user interacts with the website.

26.    First-party cookies are those that are placed on the user's device directly by the web server with which the user is knowingly communicating (in this case, the Websites' servers). First-party cookies are used to track users when they repeatedly visit the same website.

27.    A third-party cookie is set by a third-party domain/webserver (e.g., facebook.com; google.com; tiktok.com, etc.). When the user's browser loads a webpage (such as a webpage of the Websites) containing embedded third-party resources, the third parties' programming scripts typically issue HTTP commands to determine whether the third-party cookies are already stored on the user's device and to cause the user's browser to store those cookies on the device if they do not yet exist. Third-party cookies include an identifier that allows the third-party to recognize and differentiate individual users across websites (including the Websites) and across multiple browsing sessions.

28.    As described further below, the third-party cookies stored on and/or loaded from users' devices when they interact with the Websites are transmitted to those third parties, enabling them to surreptitiously track in real time and collect the Websites' users' personal information, such as their browsing activities and private communications with Defendants, including the following:

CLASS ACTION COMPLAINT

- **Browsing History**: Information about the webpages a Website's user visits, including the URLs, titles, and keywords associated with the webpages viewed, time spent on each page, and navigation patterns;

- **Visit History**: Information about the frequency and total number of visits to the Websites;

- **Website Interactions:** Data on which links, buttons, or ads on the Websites that a user clicks;

- **User Input Data**: The information the user entered into the Websites' form fields, including search queries, the user's name, age, gender, email address, location, and/or payment information;

- **Demographic Information**: Inferences about age, gender, and location based on browsing habits and interactions with the Websites' content;

- **Interests and Preferences**: Insights into user interests based on the types of content viewed, products searched for, or topics engaged with on the Websites;

- **Shopping Behavior**: Information about the Websites' products viewed or added to shopping carts;

- **Device Information**: Details about the Websites' users' devices, such as the type of device (mobile, tablet, desktop), operating system, and browser type;

- **Referring URL**: Information about the website that referred the user to the Websites;

- **Session Information**: Details about the user's current Website browsing session, including the exact date and time of the user's session, the session duration and actions taken on the Website during that session;

- **User Identifiers**: A unique ID that is used to recognize and track a specific Website user across different websites over time; and/or

- **Geolocation Data**: General location information based on a Website user's IP address or GPS data, if accessible, including whether the user is located in California.

- 7 -

CLASS ACTION COMPLAINT

(Collectively, the browsing activities and private communications listed in the bullet points above shall be referred to herein as "Private Communications").

29.     Third-party cookies can be used for a variety of purposes, including (i) analytics (e.g., tracking and analyzing visitor behavior, user engagement, and effectiveness of marketing campaigns); (ii) personalization (e.g., remembering a user's browsing history and purchase preferences to enable product recommendations); (iii) advertising/targeting (e.g., delivering targeted advertisements based on the user's consumer profile (i.e., an aggregated profile of the user's behavior, preferences, and demographics); and (iv) social media integration (e.g., enabling sharing of users' activities with social media platforms). Ultimately, third-party cookies are utilized to enhance website performance and generate revenue through data collection and targeted advertising.

30.     Defendants are consumer food and beverage companies that manufacture, market, and sell branded products directly to consumers throughout the United States, including through the Websites. Through the Websites, Defendants promote their products, provide product and nutritional information, publish recipes and other content, and enable consumers to locate retailers, engage with branded content, and, in some instances, purchase products online. Defendants design, control, and operate the Websites and the technologies embedded therein.

31.     As Website users interact with the Websites (e.g., by entering data into forms, clicking on links, and making selections), users communicate Private Communications to Defendants, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

32.     Defendants chose to install or integrate their Websites with resources from the Third Parties that, among other things, use cookies. Thus, when consumers visit the Websites, both first-party cookies and third-party cookies are placed on their devices and/or transmitted. This is caused by software code that Defendants incorporate into their Websites, or that Defendants cause to be loaded. Because Defendants control the Websites' software code, and is

- 8 -

CLASS ACTION COMPLAINT

capable of determining whether a user is accessing the Websites from California, they have complete control over whether first-party and third-party cookies are placed on its California Website users' devices and/or transmitted to third parties.

33. Defendant Campbell's explains the third-party cookies it used on its Website as follows in its Privacy and Cookies Policy:

> **Cookies, Web Pixels and Similar Technologies – Information We May Automatically Collect from Your Device**
>
> Campbell's and third parties may collect information about you when you use the Sites, using cookies, web beacons and other similar technologies. A "cookie" is a small amount of data that is sent to your browser from a web server and stored on your computer or device. Among other things, cookies allow us to facilitate the administration and improve the effectiveness of our Sites as well as further tailor and enhance your experience to your interests…
>
> We may automatically collect information about your interactions with our Sites and online ads and may combine this information with other information about you in order to customize your online experience with us. The information we automatically collect may include your IP address, referring URLs, browser and device characteristics, browsing behavior (e.g., date and time of visit, length of visit, clicks on product information or other content) and your response to our email campaigns (e.g., whether and when you open our email, the links you click). We may use cookies, and other similar industry standard technologies to capture this information.
>
> We work with third parties to help us manage various business functions, including the functionality of our websites. For example, our websites use Yext Search to provide relevant results when you use the search bar. When you interact with this feature, we may collect search queries, technical data such as IP address, browser type, and device information. This information, along with session and analytics cookies may be used to review and improve the performance of the tool bar for your use on the site.
>
> We also use third party analytics companies, such as Google Analytics and Telium, to analyze the usage of our Site for internal purposes. These analytics companies may use cookies and other tracking mechanisms to collect data about how you use our Sites and provide us with aggregate information on such usage, which helps us improve the performance of our Sites…
>
> We may allow third parties to use cookies and other online tracking tools to better understand your behavior and browsing activities, so that we can serve you targeted advertising (also commonly referred to as "interest-based" or "behavioral" advertising) while on our Sites and display our ads to you when you visit other sites. These third parties may passively collect information with these tools so that content specific to your interests can be delivered to you online…[3]

---

[3] Campbell's Privacy and Cookies Policy (updated February 10, 2026) (available at https://www.campbellsoupcompany.com/privacy-policy/) (the "Campbell's Privacy Policy"). The Campbell's Website, Rao's Website, Pacific Foods Website, and Michael Angelos Website all link to the Campbell's Privacy Policy.

- 9 -

CLASS ACTION COMPLAINT

34.     Defendants currently explain the types of cookies used on the Campbell's, Rao's, Pacific Foods, and Michael Angelos Websites as follows:

**Strictly Necessary**
These cookies are necessary for the website to function and cannot be switched off in our systems. They are usually only set in response to actions made by you which amount to a request for services, such as setting your privacy preferences, logging in or filling in forms. You can set your browser to block or alert you about these cookies, but some parts of the site will not then work. These cookies do not store any personally identifiable information.

**Analytics and Performance**
These cookies allow us to count visits and traffic sources so we can measure and improve the performance of our site. They help us to know which pages are the most and least popular and see how visitors move around the site. All information these cookies collect is aggregated and therefore anonymous. If you do not allow these cookies we will not know when you have visited our site, and will not be able to monitor its performance.

**Advertising and Social Media**
Advertising cookies may be set through our site by our advertising partners. The cookies record your visit to our website, the pages you have visited and the links you have followed. They are used to (1) deliver advertisements more relevant to you and your interests; (2) limit the number of times you see an advertisement; (3) help measure the effectiveness of an advertising campaign; and (4) understand people's behavior after they view an advertisement. This information is used in an effort to display advertising that is tailored to your interests. We may also share this information with third parties for this purpose. Disabling this function does not mean that you will see less advertising; rather you may see advertisements less relevant to your interests. Social media cookies allow users to interact more easily with social media, such as YouTube, Meta (Facebook), Twitter and Instagram. They are added to our site to enable you to share our content with your friends and networks. They may be capable of tracking your browser across other sites and building a profile of your interests. If you disable these cookies you may not be able to use these sharing tools. Please refer to the relevant social media platform's privacy policies for information about their use of cookies.

35.     In the Campbell's, Rao's, Pacific Foods, and Michael Angelos Websites' Privacy Preference Center windows, which are accessible by clicking the "Customize Settings" link in the Websites' cookie consent banners, Defendants specifically identify cookies provided by some of the Third Parties[4] as third-party unnecessary "Advertising and Social Media" cookies. This is shown in the example screenshots below from the Campbell's Website.

---

[4] Many of the Third Parties' cookies used on the Websites were not disclosed in the Websites' Privacy Preference Center windows at all.

- 10 -

CLASS ACTION COMPLAINT

**Meta Platforms, Inc. (Facebook) – disclosed on the Campbell's Website and Pacific Foods Website**



**Google LLC (YouTube and DoubleClick) – disclosed on the Campbell's Website, Rao's Website, Pacific Foods Website and Michael Angelos Website**

CLASS ACTION COMPLAINT

| Name | VISITOR_INFO1_LIVE |
| --- | --- |
| Duration | 179 Days |
| Category | Advertising and Social Media |
| Description | This cookie is used as a unique identifier to track viewing of videos |

| Name | YSC |
| --- | --- |
| Duration | Session |
| Category | Advertising and Social Media |
| Description | Testing |

**doubleclick.net**
— **View Cookies**

| Name | test_cookie |
| --- | --- |
| Duration | A few seconds |
| Category | Advertising and Social Media |
| Description | This domain is owned by Doubleclick (Google). The main business activity is: Doubleclick is Googles real time bidding advertising exchange |

**ByteDance Ltd. (TikTok) – disclosed on the Campbell's Website and Pacific Foods Website**

- 13 -

CLASS ACTION COMPLAINT

| Name | ak_bmsc |
| --- | --- |
| Duration | A few seconds |
| Category | Advertising and Social Media |
| Description | TikTok is a social media platform owned by ByteDance, known for short-form video sharing. The service is used to create and share videos, and it utilizes cookies for various purposes including advertising and analytics. |

| Name | ttwid |
| --- | --- |
| Duration | 359 Days |
| Category | Advertising and Social Media |
| Description | TikTok is a social media platform owned by ByteDance, known for short-form video sharing. The service is used to create and share videos, and it utilizes cookies for various purposes including advertising and analytics. |

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

- 14 -
CLASS ACTION COMPLAINT

**The Trade Desk, Inc. (adsrvr.org) – disclosed on the Campbell's Website**

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

- 15 -
CLASS ACTION COMPLAINT

**Amazon.com, Inc. – disclosed on the Campbell's Website**

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

CLASS ACTION COMPLAINT

**Yahoo, Inc. – disclosed on the Campbell's Website**

**analytics.yahoo.com**
View Cookies

| Name | IDSYNC |
|---|---|
| Duration | 364 Days |
| Category | Advertising and Social Media |
| Description | This domain is owned by Yahoo Inc. whose main business model is online advertising. Although this domain is associated with Yahoo's web analytics service, because these are third party cookies they can allow Yahoo, in combination with other cookies set, to collect data for targeted advertising purposes. |

**yahoo.com**
View Cookies

| Name | A3 |
|---|---|
| Duration | 365 Days |
| Category | Advertising and Social Media |
| Description | This domain is owned by Yahoo. The main business activity is: Search / Advertising |

- 17 -
CLASS ACTION COMPLAINT

**Pinterest, Inc. – disclosed on the Campbell's Website and Rao's Website**

pinterest.com

View Cookies

| Name | g_state |
|---|---|
| Duration | A few seconds |
| Category | Advertising and Social Media |
| Description | Pinterest is a social media web and mobile application company that operates a software system designed to enable saving and discovery of information on the internet using images and, on a smaller scale, GIFs and videos. |

| Name | _pinterest_sess |
|---|---|
| Duration | 359 Days |
| Category | Advertising and Social Media |
| Description | Pinterest is a social media web and mobile application company that operates a software system designed to enable saving and discovery of information on the internet using images and, on a smaller scale, GIFs and videos. |

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

- 18 -

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

CLASS ACTION COMPLAINT

CLASS ACTION COMPLAINT

36.    Defendant Bolthouse explained the third-party cookies it used on the Bolthouse Website as follows in its Privacy Policy:

**Information We Automatically Collect From You**

We may automatically collect information about your interactions with our Sites and online ads and may combine this information with other information about you in order to customize your online experience with us. The information we automatically collect may include your IP address, referring URLs, browser and device characteristics, browsing behavior (e.g., date and time of visit, length of visit, clicks on product information or other content), and your response to our email campaigns (e.g., whether and when you open our email, the links you click). We may use cookies, and other similar industry standard technologies to capture this information. A "cookie" is a small amount of data that is sent to your browser from a web server and stored on your computer or device. Among other things, cookies allow us to facilitate the administration and improve the effectiveness of our Sites as well as further tailor and enhance your experience to your interests. You may set your browser to decline cookies. If you do so, you may not be able to fully experience certain interactive features of our Sites.

We may also use third party analytics companies, such as Google Analytics or Adobe Analytics, to analyze the usage of our Site for internal purposes. These analytics companies may use cookies and other tracking mechanisms to collect data about how you use our Sites and provide us with aggregate information on such usage, which helps us improve the performance of our Sites. Please review Google's privacy policy or Adobe's privacy policy to learn more about each company's privacy practices.

We may also permit other third parties to gather information automatically on our Sites for advertising purposes, as described below in Interest-Based Advertising.

**Geolocation Information**

Our Sites may collect information on your specific location to provide location-based services, such as assisting you in finding stores that carry our products or identifying special offers that may be of interest to you…

**Information Collected From Other Sources**

We may also collect similar or additional information about you from other sources, including public databases and data aggregators. This information may include purchase behavior, market research data or publicly observed data via online activities, such as blogs, social media or other user generated content sites. We may combine this information with other information we collect from you to customize and improve the relevancy of our services to you.

**Interest-Based Advertising**

We may allow third parties to use cookies and other online tracking tools to better understand your behavior and browsing activities, so that we can serve you targeted advertising (also referred to as "interest-based advertising") while on our Sites and display our ads to you when you visit other sites. These third parties

- 21 -

CLASS ACTION COMPLAINT

may passively collect information with these tools so that content specific to your interests can be delivered to you online…[5]

37. Defendant Bolthouse further represented in the cookie consent banner after a Website user clicked the "Show Details" link that "[t]he law states that we can store cookies on your device if they are strictly necessary for the operation of this site. For all other types of cookies we need your permission."

38. Defendant Bolthouse further explained the types of third-party cookies it used on the Bolthouse Website as follows in the cookie consent banner after a Website user clicked the "Show Details" link:

**Necessary (7)**
Necessary cookies help make a website usable by enabling basic functions like page navigation and access to secure areas of the website. The website cannot function properly without these cookies.

**Preferences (0)**
Preference cookies enable a website to remember information that changes the way the website behaves or looks, like your preferred language or the region that you are in.

**Statistics (9)**
Statistic cookies help website owners to understand how visitors interact with websites by collecting and reporting information anonymously.

**Marketing (6)**
Marketing cookies are used to track visitors across websites. The intention is to display ads that are relevant and engaging for the individual user and thereby more valuable for publishers and third party advertisers.

39. Defendant Bolthouse specifically identified cookies provided by Facebook as third party unnecessary "Marketing" cookies as shown in the following screenshots.

---

[5] Bolthouse Privacy Policy (as of April 10, 2025) (available at https://www.bolthouse.com/legal/) (the "Bolthouse Privacy Policy"). Bolthouse has subsequently updated its privacy policy but, based on information and belief, this version was in effect at the time of Plaintiff Yogev's rejection of cookies on the Bolthouse Website. Defendant Generous Brands makes similar representations in its privacy policy currently available on the Bolthouse Website. *See* https://www.generousbrands.com/Legal/.

CLASS ACTION COMPLAINT



**B.    Defendants Falsely Informed Users That They Could Opt-Out of or Reject All Unnecessary Cookies on the Websites.**

40.    When Plaintiffs and other consumers in California visited any of the Websites, the Website immediately displayed to them a popup cookie consent banner indicating that the consumers could reject or opt-out of unnecessary cookies.

41.    As shown in the screenshot in the Introduction, the cookie consent banner on the Campbell's Website stated, in relevant part, "We use cookies to personalize and enhance your experience on our site. Visit our Privacy Policy to learn more and manage your preferences via our Your Choices tool." The banner then purported to provide users the opportunity to either "Accept" such cookies or otherwise adjust or manage cookie preferences.

42.    Further, as shown in the screenshot in the Introduction, the cookie consent banner on the Bolthouse Website stated, in relevant part, "We use cookies to personalise content and ads, to provide social media features and to analyse our traffic. We also share information about your use of our site with our social media, advertising and analytics partners who may combine

CLASS ACTION COMPLAINT

it with other information that you've provided to them or that they've collected from your use of their services." The banner then purported to provide users the opportunity to choose to either "Allow all cookies" or "Use necessary cookies only."

43.     The Rao's, Pacific Foods, and Michael Angelos Websites each display a substantively identical popup cookie consent banner to all Website users.[6] As shown in the screenshot below, the cookie consent banner stated, in relevant part, "This website uses cookies (not the edible kind!) and similar technologies to operate, analyze and improve the functionality of our websites and to assist in our marketing efforts. Some cookies are necessary for our websites to function properly." The banner then purported to provide users the opportunity to either "Accept All Cookies," or accept "Strictly Necessary Cookies only," or "Customize Settings," as shown in the following screenshot from the Rao's Website:

This website uses cookies (not the edible kind!) and similar technologies to operate, analyze and improve the functionality of our websites and to assist in our marketing efforts. Some cookies are necessary for our websites to function properly. To change your preferences, select **Customize Settings**. If you select the Allow All button you are accepting all cookies we use. Please visit our **Privacy and Cookie Policy** and online **Terms of Use** to learn more.

Customize Settings

Strictly Necessary Cookies only

Accept All Cookies

44.     Plaintiff Spears and other Campbell's Website users who clicked or selected the "Options" button were then directed to Defendant Campbell's "Your Choices" tool where Defendant expressly represented to its users in relevant part that, "We may collect and share your personal information via cookies or similar technologies with third parties who help us better understand your behavior and browsing activities in order to, for example, personalize your online experience, serve you targeted advertising (referred to as 'interest-based advertising') or provide us with analytics services. The list below provides details on our third-party vendors and lets you opt-out of their use of such cookies by setting the related toggle-

---

[6] The popup cookie consent banner that currently appears on the Campbell's Website is substantively identical to the screenshot shown and the banners on the Rao's, Pacific Foods, and Michael Angelos Websites.

- 24 -

CLASS ACTION COMPLAINT

switch button." Further, the "Your Choices" tool on the Campbell's Website provided toggle-switch buttons to apparently opt-out of "Ad Network," "Retargeter," "Ad Server," "Analytics Provider," "Business Intelligence," "Advertiser," "Data Aggregator/Supplier," "Ad Exchange," "Demand Side Platform," and "Data Management Platform" cookies. The window also prominently featured an "Opt-Out All" button to apparently opt-out of all categories of unnecessary cookies. The following screenshots depict the "Your Choices" tool that appeared on the Campbell's Website:



CLASS ACTION COMPLAINT

45.     Plaintiffs and other Website users who clicked or selected the "Use necessary cookies only," "Strictly Necessary Cookies Only," and/or "Opt-Out All" buttons, thereby indicating their choice and/or agreement to opt-out of or reject all cookies and tracking technologies in use on the Websites, except those necessary for the Websites to function, could

CLASS ACTION COMPLAINT

then continue to browse the Websites, as the popup cookie consent banner and the Campbell's Website's Your Privacy Choices window disappeared.

46. Defendants' popup cookie consent banners and Your Privacy Choices window formerly used on the Campbell's Website led Plaintiffs, and all those users of the Websites similarly situated, to believe that they opted out of or rejected all unnecessary cookies and tracking technologies, especially those used to for interest-based advertising or analytics services. The popup cookie consent banners and the Campbell's Website's Your Privacy Choices window further reasonably led Plaintiffs and similarly situated users of the Websites to believe that Defendants would not allow third parties, through cookies, to access their Private Communications with the Website, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, upon clicking or selecting the "Use necessary cookies only," "Strictly Necessary Cookies Only," and/or "Opt-Out All" buttons on the respective Websites.

47. Defendants' representations, however, were false. In truth, Defendants did not abide by Plaintiffs' or other Website users' wishes. When Plaintiff and other Website users clicked or selected the "Use necessary cookies only," "Strictly Necessary Cookies Only," and/or "Opt-Out All" buttons on the respective Websites, they provided notice to Defendants that they did not consent to the placement or transmission of third-party cookies that would allow those parties to obtain their Private Communications with the Websites.

48. Nevertheless, even after receiving that notice, Defendants caused the Third-Party tracking cookies to be placed on Website users' browsers and devices and/or transmitted to the Third Parties along with user data.

49. In particular, when users clicked or selected the "Use necessary cookies only," "Strictly Necessary Cookies Only," and/or "Opt-Out All" buttons on the respective Websites, Defendants nonetheless continued to cause the Third Parties' cookies to be placed on users' devices and/or transmitted to the Third Parties along with user data, enabling them to collect user data in real time that discloses Website visitors' Private Communications, including browsing

history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data. In other words, even when consumers like Plaintiffs tried to protect their privacy by rejecting cookies, Defendants failed to prevent cookies from being transmitted to Third Parties, enabling them to track user behavior and communications.

50.     Some aspects of the operations of the Third-Party cookies on the Websites can be observed using specialized tools that log incoming and outgoing Website network transmissions. The following screenshots, obtained using one such tool, show examples of Third-Party cookies being transmitted from a Website user's device and browser to Third Parties, even after the user clicked or selected the "Use necessary cookies only," "Strictly Necessary Cookies Only," and/or "Opt-Out All" buttons on the respective Websites.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

CLASS ACTION COMPLAINT

1.      **Campbell's Website.**

CLASS ACTION COMPLAINT

CLASS ACTION COMPLAINT



**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

CLASS ACTION COMPLAINT

2.     **Bolthouse Website.**



CLASS ACTION COMPLAINT

3. Rao's Website.



- 33 -
CLASS ACTION COMPLAINT

- 34 -

CLASS ACTION COMPLAINT



**4.      Pacific Foods Website.**



**5.     Michael Angelos Website.**



51.     The screenshots above show the "Network" tab of Chrome Developer Tools, which contains a list of HTTP network traffic transmissions between the user's browser and various third-party websites while the user visited and interacted with each Website. The screenshots depict only network traffic occurring *after* the user opted out of or rejected all unnecessary cookies using the button on the cookie consent banner and/or the Your Choices tool. As shown above, despite the user's choice to opt-out of or reject all cookies, other than those

necessary for the Website to function, the user's interactions with the Website resulted in the user's browser making a large number of GET and POST HTTP requests to third party web domains like facebook.com, google.com, tiktok.com, and others. As further shown in the right-hand column of the screenshots, the user's browser sent cookies along with those HTTP requests to the third parties. These screenshots demonstrate that Defendants caused third-party cookie data and users' Private Communications to be transmitted to Third Parties, even after consumers opted out of or rejected all unnecessary cookies and tracking technologies by clicking the appropriate button. All of these network calls are made to the Third Parties without the user's knowledge, and despite the user's rejection of all such cookies.

52.     Plaintiffs' and other Website users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, are surreptitiously obtained by the Third Parties via these cookies.

53.     As users interact with the Websites, even after clicking or selecting the "Use necessary cookies only," "Strictly Necessary Cookies Only," and/or "Opt-Out All" buttons on the respective Websites, thereby opting out of or rejecting the use of cookies and similar technologies for personalized content, targeted or interest-based advertising, and analytics, as well as the sale or sharing of the user's personal information with third parties for such functions, or other purposes, more data regarding users' behavior and communications are sent to third parties, alongside the cookie data. The third-party cookies that Defendants wrongfully allow to be stored on users' devices and browsers, and to be transmitted to the Third Parties, cause the Third Parties to track and collect data on users' behaviors and communications, including Private Communications, on the Websites. Because third-party cookies cause the Third Parties to track users' behavior across the Internet and across time, user data can be correlated and combined with other data sets to compile comprehensive user profiles that reflect consumers' behavior, preferences, and demographics (including psychological trends, predispositions, attitudes, intelligence, abilities, and aptitudes). These Third Parties monetize user profiles for advertising,

- 37 -
CLASS ACTION COMPLAINT

sales, and marketing purposes to generate revenue and target advertising to Internet users. Advertisers can gain deep understanding of users' behavioral traits and characteristics and target those users with advertisements tailored to their consumer profiles and audience segments.

54.     The Third Parties' code that the Websites cause to be loaded and executed by the user's browser constitutes a wiretap because, when it is executed, it causes the Third Parties—separate and distinct entities from the parties to the conversations—to use cookies to eavesdrop upon, record, extract data from, and analyze conversations to which they are not parties. When the Third Parties use their respective wiretaps on Website users' Private Communications, the wiretaps are not like tape recorders or "tools" used by one party to record the other. The Third Parties each have the capability to use the contents of conversations they collect through their respective wiretaps for their own purposes as described in more detail below.

55.     Website users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, are surreptitiously obtained by the Third Parties via these cookies.

56.     As users interact with the Websites, even after clicking or selecting the "Use necessary cookies only," "Strictly Necessary Cookies Only," and/or "Opt-Out All" buttons on the respective Websites, thereby opting out of or rejecting the use of cookies and similar technologies for social media, advertising, and analytics purposes, as well as the sale or sharing of the user's personal information with third parties for such functions, or other purposes, more data regarding users' behavior and communications are sent to third parties, alongside the cookie data. The third-party cookies that Defendants wrongfully allow to be stored on users' devices and browsers, and to be transmitted to the Third Parties, enable the Third Parties to track and collect data on users' behaviors and communications, including Private Communications, on the Websites. Because third-party cookies enable Third Parties to track users' behavior across the Internet and across time, user data can be correlated and combined with other data sets to compile comprehensive user profiles that reflect consumers' behavior, preferences, and demographics

- 38 -

CLASS ACTION COMPLAINT

(including psychological trends, predispositions, attitudes, intelligence, abilities, and aptitudes). These Third Parties monetize user profiles for advertising, sales, and marketing purposes to generate revenue and target advertising to Internet users. Advertisers can gain deep understanding of users' behavioral traits and characteristics and target those users with advertisements tailored to their consumer profiles and audience segments.

57.    The Third Parties' code that the Websites cause to be loaded and executed by the user's browser becomes a wiretap when it is executed because it enables the Third Parties— separate and distinct entities from the parties to the conversations—to use cookies to eavesdrop upon, record, extract data from, and analyze conversations to which they are not parties. When the Third Parties use their respective wiretaps on Website users' Private Communications, the wiretaps are not like tape recorders or "tools" used by one party to record the other. The Third Parties each have the capability to use the contents of conversations they collect through their respective wiretaps for their own purposes as described in more detail below.

**C.    The Private Communications Intercepted and Collected Through Third-Party Cookies on Defendants' Websites[7].**

**1.    The Website Causes the Interception of the Contents of Communications.**

58.    Each of the Websites include a search bar and other input fields which users enter information. For example, below are screenshots of the search bar currently available on the Bolthouse Website where users can type into the search box to cause the Bolthouse Website to search its contents.



---

[7] This section contains multiple examples of specific data being sent from a user's browser to third parties. Each example was collected after the user had clicked or selected the "Use necessary cookies only," "Strictly Necessary Cookies Only," and/or "Opt-Out All" button on the respective Website.

CLASS ACTION COMPLAINT



59.     When users input the information into the search bar, they intend to communicate the contents of their search directly to the Websites.

60.     Instead, Defendants programmed the Websites so that the contents of those communications are intercepted by the Third Parties while the communications are in transit between the users' browser and the Websites.

61.     For example, the Bolthouse Website causes consumers' search strings to be transmitted to Meta—even after consumers have rejected all unnecessary cookies. In the example below, the test string "privacy coffee" was sent to Meta along with the cookie data:



CLASS ACTION COMPLAINT



### 2.    Facebook Cookies (Bolthouse, Rao's and Pacific Foods Websites).

62.    The Bolthouse, Rao's, and Pacific Foods Websites also cause third party cookies to be transmitted to and from users' browsers and devices to and from the **facebook.com** domain, even after users elect to reject all unnecessary cookies. This domain is associated with Meta's digital advertising and analytics platform that collects user information via cookies to assist Meta in performing data collection, behavioral analysis, user retargeting, and analytics.[8] Meta serves targeted ads to web users across Meta's ad network, which spans millions of websites and apps.

63.    Cookies help Meta track what actions users perform on websites (e.g., clicking a link, viewing a page, interacting with an ad, or making a purchase) and provide analytic metrics that advertisers use to measure ad campaign performance.

64.    For example, the Bolthouse Website causes the following data to be sent to Meta:

---

[8] https://www.facebook.com/privacy/policies/cookies/.

https://www.facebook.com/privacy_sandbox/p
GET    m%2Fproducts%2F&rl=https%3A%2F%2Fwww.bolth
200    r=stable&ec=0&o=12318&fbp=fb.1.17442211014

**Request**  Header  **Query**  Body  Cookies  Raw  | Summary  +

| Key | ∧ | Value |
|---|---|---|
| cdl | | API_unavailable |
| coo | | false |
| dl | | https://www.bolthouse.com/products/ |
| ec | | 0 |
| ev | | PageView |
| exp | | k0 |
| fbp | | fb.1.1744221101460.564176017402506207 |
| id | | 711389576880743 |
| if | | false |
| it | | 1744221118144 |
| o | | 12318 |
| r | | stable |
| rl | | https://www.bolthouse.com/products/dressings/ |
| rqm | | FGET |
| sh | | 1440 |
| sw | | 2560 |
| ts | | 1744221118147 |
| v | | 2.9.195 |
| | | e%20or%20tea.%20Our%20USDA-certified%20organic%20bone%20broth%20is%20made%20from%20non-GMO%20ingredients%20and%20free%20of%20gluten%2C%20soy%2C%20wheat%20and%20yeast."%7D%5D |
| pmd[description] | | Experience%20layers%20of%20nourishing%20flavor%20with%20Pacific%20Foods%C2%AE%20Organic%20Unsalted%20Chicken%20Bone%20Broth. |
| pmd[locale] | | en_US |
| r | | stable |
| rl | | |
| rqm | | FGET |
| sh | | 1440 |
| sw | | 2560 |
| tm | | 3 |

- 42 -

CLASS ACTION COMPLAINT

65. As shown above, the "dl" parameter (which stands for "Document Location") discloses the specific webpage that the user accessed (i.e., "https://www.bolthouse.com/products") to Meta.

66. Similarly, the Rao's Website causes the following data to be sent to Meta when a user enters the search query "sauce-test-string" on the Website:



| Key | Value |
| --- | --- |
| expv2[0] | pl1 |
| expv2[1] | el2 |
| expv2[2] | bc1 |
| expv2[3] | ra2 |
| expv2[4] | rp2 |
| expv2[5] | ct2 |
| expv2[6] | hf0 |
| fbp | fb.1.1773608762270.182341101483220113 |
| id | 1530404200863305 |
| if | false |
| it | 1773608817321 |
| ler | other |
| o | 12318 |
| plt | 781.0999999999767 |
| pmd[description] | Rao%26%2339%3Bs%20now%20ships%20nationwide%2 0on%20Goldbelly%2C%20a%20curated%20marketplace %20for%20America%E2%80%99s%20most%20famous% 20gourmet%20food%20%26amp%3B%20gifts%20with% 20450%2B%20food%20makers%20from%2046%20state s. |
| pmd[keywords] | goldbely%2C%20goldbelly%2C%20gourmet%20food%2C %20gourmet%20food%20gifts%2C%20food%20gifts%2 C%20gift%20baskets%2C%20corporate%20gifts%2C%2 0foodie%20gifts%2C%20mail%20order%20food%2C%20 order%20food%2C%20order%20bbq%2C%20order%20ic e%20cream%2C%20order%20brownies%2C%20new%20 york%20food%2C%20chicago%20food%2C%20new%20 orleans%20food |
| r | stable |
| rl | https%3A%2F%2Fraos.goldbelly.com%2Fcategories%2Fs auces |
| rqm | GET |
| sh | 1440 |
| sw | 2560 |
| ts | 1773608817796 |
| v | 2.9.277 |

67. As shown above, the "dl" parameter (which stands for "Document Location") discloses the user's search query (i.e., "sauce-test-string") to Meta.

68. Cookies are sent along with all data transmissions to Meta. For instance, the following type of cookies are sent to Meta when a user browses the Bolthouse Website:

- 44 -

CLASS ACTION COMPLAINT

| Key | Value |
| --- | --- |
| datr | 5mbYZ1jKbXy6aDYmQeG12nLl |
| sb | 5mbYZ56GJQ_sWb_zfkbhZwT5 |
| c_user | 100076133960803 |
| fr | 1oqF5JFIgoR3AjVJ3.AWeAzzDk3s-Qgn4IDJMPOaT94ffFTDhNe7s3WTzT-SQhfyxGm8M.Bn9E92..AAA.0.0.Bn9E92.AWcCrDk2n5QftBI19IbV0mQzDgc |
| xs | 3%3ALn6HViH61md_pA%3A2%3A1742235391%3A-1%3A-1%3A%3AAcUf0ocX8ynJDUGp9iPSbGROrlkmxUvMy20EkEa-CQ |
| ar_debug | 1 |

69.    The "c_user" cookie shown above enables Facebook to identify a specific user when they are logged in to their account. The "c_user" cookie stores a user's unique ID, which is associated with their Facebook profile. This ID enables Facebook to track user interactions on its platform and across sites that use Facebook plugins, such as adding items to a cart, clicking "Like" buttons, or engaging with comment sections. When combined with other data sent to the Facebook domain, this cookie allows Meta to track users' browsing activities. Facebook uses this data for various purposes, such as personalizing content, enhancing ad targeting accuracy, and refining its user experience.

70.    The Rao's and Pacific Foods Websites are substantially same in the way they cause data to be sent to Meta. For example, the following cookies were sent to Meta along with the search query on the Rao's Website:

CLASS ACTION COMPLAINT

71.     The Pacific Foods Website caused the following type of data to be sent to Meta after the user rejected all unnecessary cookies:

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

CLASS ACTION COMPLAINT

CLASS ACTION COMPLAINT

| | |
|---|---|
| expv2[0] | pl1 |
| expv2[1] | el2 |
| expv2[2] | bc1 |
| expv2[3] | ra2 |
| expv2[4] | rp2 |
| expv2[5] | im0 |
| expv2[6] | hf0 |
| fbp | fb.1.1773638052871.56840720346874787 |
| id | 2630002670473482 |
| if | false |
| it | 1773638052864 |
| ler | empty |
| o | 12318 |
| plt | 343.8999999985099 |
| pmd[contents] | %5B%7B"name"%3A"Organic%20Unsalted%20Chicken%20Bone%20Broth"%2C"description"%3A"Experience%20layers%20of%20nourishing%20flavor%20with%20Pacific%20Foods%C2%AE%20Organic%20Unsalted%20Chicken%20Bone%20Broth.%20We%20slow-simmer%20organic%20chicken%20bones%20and%20apple%20cider%20vinegar%20for%20a%20savory%20bone%20broth%20that%E2%80%99s%20full%20of%20naturally%20occurring%20collagen%20without%20high%20sodium.%20Sip%20a%20cup%20of%20warm%20chicken%20bone%20broth%20instead%20of%20coffe |

- 48 -

CLASS ACTION COMPLAINT

72.     By identifying users who have shown interest in certain products or content, the facebook.com cookies enable Meta's advertising platform to enable advertisers to show relevant ads to those users when they visit other websites within Meta's ad network.[9] These cookies allow Meta to collect data on how users interact with websites, regardless of whether they have a Facebook account or are logged in.[10]

73.     The facebook.com cookies allow Meta to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors,

---

[9] *Id.*; https://allaboutcookies.org/what-data-does-facebook-collect
[10] https://allaboutcookies.org/what-data-does-facebook-collect.

CLASS ACTION COMPLAINT

(viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data (including IP addresses).[11]

74. Meta utilizes the data collected through the facebook.com cookies for its own purposes, including by using the data to tailor content and target advertisements to users. This includes practices such as (i) Ad Targeting and Retargeting, in which Meta uses the facebook.com cookie to track users' online behavior across different sites, building a profile based on their browsing habits, purchases, and interactions. This profile enables Facebook to deliver highly targeted ads within the Facebook ecosystem and on other sites that are part of Facebook's Audience Network; (ii) Conversion Tracking, in which Meta uses the facebook.com cookie to enable business partners to track specific actions users take after viewing or clicking on a Facebook ad, such as making a purchase or signing up for a newsletter; (iii) Audience Insights and Analytics, in which Meta uses the facebook.com cookie to provide data to businesses on user demographics, interests, and behaviors across their sites and apps; and (iv) Cross-Device and Cross-Platform Tracking, in which Meta uses the facebook.com cookie to support tracking users across devices and platforms, so that ads are targeted consistently regardless of the device a user is on. This ensures that advertisers can follow users across devices.

75. In addition, Meta receives the user's user-agent and IP address along with each and every network transmission to the Facebook website.

**3.    Google Cookies (the Campbell's, Rao's, Pacific Foods, and Michael Angelo's Websites).**

76. Defendants caused third party cookies to be transmitted to and from Website users' browsers and devices while visiting the Campbell's, Rao's, Pacific Foods, Michael Angelo's Websites, even after users opted out of or rejected all unnecessary cookies, to and from Google domains, such as **google.com, doubleclick.net**, **google-analytics.com**, and **youtube.com**. Each of these domains is associated with Google LLC's digital advertising and analytics platform that collects user information via cookies to assist Google in performing data

---

[11] *Id.*

CLASS ACTION COMPLAINT

collection, behavioral analysis, user retargeting, and analytics.[12] Google serves targeted ads to web users across Google's ad network, which spans millions of websites and apps. Nearly 20% of web traffic is tracked by Google's DoubleClick cookies.[13] Google's cookies help it track whether users complete specific actions after interacting with an ad (e.g., clicking a link or making a purchase) and provide analytic metrics that advertisers use to measure ad campaign performance. Further, by identifying users who have shown interest in certain products or content, Google's cookies enable its advertising platform to enable advertisers to show relevant ads to those users when they visit other websites within Google's ad network.[14]

77. Specifically, Google sends cookies when a web user visits a webpage that shows Google Marketing Platform advertising products and/or Google Ad Manager ads.[15] "Pages with Google Marketing Platform advertising products or Google Ad Manager ads include ad tags that instruct browsers to request ad content from [Google's] servers. When the server delivers the ad content, it also sends a cookie. But a page doesn't have to show Google Marketing Platform advertising products or Google Ad Manager ads for this to happen; it just needs to include Google Marketing Platform advertising products or Google Ad Manager ad tags, which might load a click tracker or impression pixel instead." *Id.* As Google explains, "Google Marketing Platform advertising products and Google Ad Manager send a cookie to the browser after any impression, click, or other activity that results in a call to our servers." *Id.*

78. Google also uses cookies in performing analytical functions. As Google explains, "Google Analytics is a platform that collects data from [] websites and apps to create reports that provide insights into [] business[es]."[16] "To measure a website … [one] add[s] a small piece of JavaScript measurement code to each page on [a] site." *Id.* Then, "[e]very time a user visits a webpage, the tracking code will collect … information about how that user interacted with the

[12] *See* Our advertising and measurement cookies (available at https://business.safety.google/adscookies/).
[13] *See, e.g.* https://www.ghostery.com/whotracksme/trackers/doubleclick.
[14] *See, e.g.* About cross-channel remarketing in Search Ads 360 (available at https://support.google.com/searchads/answer/7189623?hl=en); About dynamic remarketing for retail (available at https://support.google.com/google-ads/answer/6099158?hl=en&sjid=1196213575075458908-NC).
[15] *See* How Google Marketing Platform advertising products and Google Ad Manager use cookies (available at https://support.google.com/searchads/answer/2839090?hl=en&sjid=1196213575075458908-NC); *see also* Cookies and user identification (available at https://developers.google.com/tag-platform/security/concepts/cookies).
[16] How Google Analytics Works (available at https://support.google.com/analytics/answer/12159447?hl=en).

CLASS ACTION COMPLAINT

page." *Id.* Google Analytics enables website owners to "measure when someone loads a page, clicks a link, [ ] makes a purchase;" "completes a purchase"; "searches [] website or app"; "select content on [] website or app"; "views an item"; and "views their shopping cart."[17]

79.     Google's cookies allow it to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data—including whether a user is located in California.[18]

80.     For example, the Google software code that the Campbell's Website causes to be stored on and executed by the user's device causes the following data to be sent to Google's advertising domain, at https://googleads.g.doubleclick.net:

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

---

[17] Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://developers.google.com/analytics/devguides/collection/ga4/events).
[18] *See* About the Google Tag (available at https://support.google.com/searchads/answer/7550511?hl=en); How Floodlight Recognizes Users (available at https://support.google.com/searchads/answer/2903014?hl=en); How Google Ads tracks website conversions (available at https://support.google.com/google-ads/answer/7521212); Google Ads Help, Cookie: Definition (available at https://support.google.com/google-ads/answer/2407785?hl=en); About demographic targeting in Google Ads (available at https://support.google.com/searchads/answer/7298581?hl=en&sjid=1196213575075458908-NC&visit_id=638670675669576522-2267083756&ref_topic=7302618&rd=1); How Google Analytics Works (https://support.google.com/analytics/answer/12159447); Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://support.google.com/analytics/answer/9267735).

CLASS ACTION COMPLAINT

81.    The "url" and "tiba" parameters disclose to Google the exact webpage and title that the user was viewing.

82.    The "dl" parameter refers to "Document Location." It discloses to Google the URL that the user was visiting. The "dt" parameter refers to "Document Title."

- 53 -

83. The "u_h" and "u_w" parameters correspond to the user's screen height and width.

84. The parameters beginning in "ua…" tell Google extensive information about the user's device and browser, including the specific operating system, browser brand, and device processor.

85. Along with this data, the Google software code that Defendants cause to be stored on and executed by the user's device causes the following cookies to be sent to Google's domain. For example, the following cookie data was sent to Google after the user rejected cookies on the Campbell's Website:



86. Google documentation confirms that the "IDE" cookie is used for advertising. Specifically, it is "used to show Google ads on non-Google sites."[19]

87. Further, along with all of this data, the Google software code that Defendants causes to be stored on and executed by the user's device causes the user's "user-agent" information to be sent to Google:

user-agent        Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/ 119.0.0.0 Safari/537.36

88. The "user-agent" corresponds to the device and browser that the user has used to access the Websites.

89. Finally, the data sent to Google contains the user's IP address—which can be used to determine a user's geolocation, including whether they are located in California.

[19] https://policies.google.com/technologies/cookies?hl=en-US.

CLASS ACTION COMPLAINT

90.    Similarly, the following type of data is sent to Google's domain googleads.g.doubleclick.net after a user rejects all cookies on the Rao's Website:

https://googleads.g.doubleclick.net/pagead/viewthro
uid=ON&async=1&en=conversion&gtm=45be63b1v919514938
26~103200004~115938466~115938468~116024733~11748425
z%3Fref%3Dsearch&ref=https%3A%2F%2Fraos.goldbelly.c
%20Sauce%20(24%20oz.)%20by%20Rao%27s%20-%20Goldbell
8761&uaa=arm&uab=64&uafvl=Chromium%3B146.0.7680.80%
POST
302
acOS&uapv=26.1.0&uaw=0&_tu=CA&gcl_ctr=1~0~0&categor
cOxAgiKxbECCMLJsQIItMaxAgiT2rECCNvcsQIIh9uxAgjTxbEC
JaAwoBAWIDCgED&cerd=CgSI3b0t&eitems=ChEI8LHZzQYQjLX
dUoEiwAphwSfC1rQvYjMA4qLYfexI1l8fr5Q9rLtbrHVryh6Qhl
YggIABAAGAAgADIMCAdiCAgAEAAYACAAMgwICGIICAAQABgAIAA
BViCAgAEAAYACAAMgwIH2IICAAQABgAIAAyDAgTYggIABAAGAAg
RNSGNvNkR2OUxNakVpd0FWRmU4MHZqR0V4N25GUXg3TFRFNFJTW

Request   Header   Query   Body   Cookies   Raw   |   Summary   +

| Key | Value |
| --- | --- |
| _tu | CA |
| async | 1 |
| auid | 1006258350.1773608761 |
| bg | ffffff |
| capi | 1 |
| category | acrcp_v1_512 |
| cerd | CgSI3b0t |
| crd | CLTesQIIobixAgixwbECCLDBsQIIscOxAgiKxbECCMLJsQIIt MaxAgiT2rECCNvcsQIIh9uxAgjTxbECCOvMsQII7c6xAgjVz 7ECCPTasQIII9SxAgjJ27ECCLHhsQIIs- GxAgim3bECCLDesQJKB3RyaWdnZXJaAwoBAWIDCgED |
| ct_cookie_present | false |
| cv | 11 |
| dma | 0 |
| eitems | ChEI8LHZzQYQjLX9o7fQ8JbQARIdAKYy5NTdNheJOWjcXy 7NrrZp9tuu66sDvInNWOs |
| en | conversion |
| fmt | 8 |
| frm | 0 |
| fsk | ChAI8LHZzQYQgp7vmeO2zdUoEiwAphwSfC1rQvYjMA4qL YfexI1l8fr5Q9rLtbrHVryh6QhIIM2ISNmquDC2HxoCIwI |
| fst | 1773608828391 |
| gcd | 13I3I3I3I1I1 |

CLASS ACTION COMPLAINT

| | |
|---|---|
| gcl_ctr | 1~0~0 |
| gtm | 45be63b1v9195149381z877141556za20gzb77141556z d77141556xea |
| guid | ON |
| hn | www.googleadservices.com |
| label | bgnsCNzjy7cDEN3V14ED |
| npa | 0 |
| pscdl | noapi |
| pscrd | IhMIo-nC4eeikwMVD1oIBB3RZQyuMgwIA2IICAAQABgAIAAyDAg EYggIABAAGAAgADIMCAdiCAgAEAAYACAAMgwICGIICAAQ ABgAIAAyDAgJYggIABAAGAAgADIMCApiCAgAEAAYACAA MgwIAmIICAAQABgAIAAyDAgLYggIABAAGAAgADIMCBViC AgAEAAYACAAMgwIH2IICAAQABgAIAAyDAgTYggIABAAGA AgADIMCBJiCAgAEAAYACAAOhtodHRwczovL3Jhb3MuZ2 9sZGJlbGx5LmNvbVS9CVkNoQUk4TEhaeIFZUTRNSGNvNk R2OUxNakVpcd0FWRmU4MHZqR0V4N25GUXg3TFRFNFJT Wjk2Skw1SFFjT3VmaEdjjMnRUYmFlZG1lakQ3c1l0VGl3Wn NRegwICWIICAAQABgAIAA |
| random | 1194743329 |
| ref | https://raos.goldbelly.com/categories/sauces |
| tag_exp | 103116026~103200004~115938466~115938468~1160 24733~117484252 |
| tiba | Marinara Sauce (24 oz.) by Rao's - Goldbelly |
| u_h | 1440 |
| u_w | 2560 |
| uaa | arm |
| uab | 64 |
| uafvl | Chromium;146.0.7680.80|Not-A.Brand;24.0.0.0| Google%20Chrome;146.0.7680.80 |
| uam | |
| uamb | 0 |
| uap | macOS |
| uapv | 26.1.0 |
| uaw | 0 |
| url | https://raos.goldbelly.com/marinara-sauce-24-oz? ref=search |
| value | 0 |

CLASS ACTION COMPLAINT

91.     The following cookie data was sent to youtube.com after a user rejected cookies on the Pacific Foods Website:

92.     The "__Secure-3PAPISID" and "__Secure-3PSID" cookies used on the Website are utilized by Google to build a profile of Website user interests to show relevant and personalized ads through retargeting.

93.     The following type of data is sent to doubleclick.net after the user rejects all cookies on the Michael Angelo's Website:

CLASS ACTION COMPLAINT

CLASS ACTION COMPLAINT

| frm | 0 |
|-----|---|
| tiba | Baked Ziti with Meatballs \| Michael Angelo's |
| hn | www.googleadservices.com |
| npa | 0 |
| pscdl | noapi |
| auid | 257444504.1773640606 |
| uaa | arm |
| uab | 64 |
| uafvl | Chromium;146.0.7680.80\|Not-A.Brand;24.0.0.0\|Google%20Chrome;146.0.7680.80 |
| uamb | 0 |
| uam | |
| uap | macOS |
| uapv | 26.1.0 |
| uaw | 0 |
| data | event=gtag.config |
| gap.plf | 5 |
| rfmt | 3 |
| fmt | 4 |

```
https://googleads.g.doubleclick.net/pagead/viewthroughconv
40770677&bg=ffffff&guid=ON&async=1&en=gtag.config&gtm=45be
c&gcd=13l3l3l3l1l11&dma=0&tag_exp=103116026~103200004~11561
GET  &u_w=2560&u_h=1440&url=https%3A%2F%2Fmichaelangelos.com%2F
200  rve&ref=https%3A%2F%2Fmichaelangelos.com%2Four-food%2F%3Ff
     Meatballs%20%7C%20Michael%20Angelo%27s&hn=www.googleadserv
     aa=arm&uab=64&uafvl=Chromium%3B146.0.7680.80%7CNot-A.Brand
     &uam=&uap=macOS&uapv=26.1.0&uaw=0&data=event%3Dgtag.config
```

**Request** Header Query Body Cookies Raw | Summary +

| Key | Value |
|-----|-------|
| ar_debug | 1 |
| __ps_r | https://www.etsy.com/ |
| __ps_lu | https://14895689.fls.doubleclick.net/activityi |
| __ps_did | pscrb_f92b7c70-b218-427f-a327-cf94de656ccd |
| __ps_fva | 1761406649645 |
| permutive-id | a8a5cb0c-aa7d-4379-ac8f-b60bdbc4fdc3 |
| DSID | AERR2t2MrPI3idzqPUqoROcrEjay4EzeCZPiFPHdMBGVKGrhoLpDXOoB0VdeN2_QCDVc-265L4uioPDq1JiUPrXZAPFQr0xvH9X_HAZXIBN8ilDySyvilFlqa25ozghrF_kIxyJQ-r0-tEhPJf0XsfyNkl9euqxKwF-bhpm1byi43rIPhrvOkcX85Z8Dyy0WGhdGUka01-LDwt3NqlmOD_r3IeAYrcHSbzJGERMfeb8Hm0V_Xskaf6-N9DZuH8PdlKj54AdOzsFfnhhVfNcV58K8BglG1WWwVJjLgV6lU7Z7ld5d1cSo5DHarblaWCx-r_LzlszADtsh |
| IDE | AHWqTUknofmmvaopNXenvPlXHbtTdK9WqjlxXoEHP-D86l_42K-CuSpufxuH6-0HAVU |

- 60 -

CLASS ACTION COMPLAINT

94.     Further, the Michael Angelo's website causes user's search strings to be intercepted by Google. For example, when the user searches the Website for "San Francisco," the search string is sent to Google at its google.com domain:



CLASS ACTION COMPLAINT

| ref | https://michaelangelos.com/product/baked-ziti-w-meatballs/?size=single-serve |
| --- | --- |
| frm | 0 |
| tiba | Where to Buy \| Michael Angelo's |
| hn | www.googleadservices.com |
| npa | 0 |
| pscdl | noapi |
| auid | 257444504.1773640606 |
| uaa | arm |
| uab | 64 |
| uafvl | Chromium;146.0.7680.80\|Not-A.Brand;24.0.0.0\|Google%20Chrome;146.0.7680.80 |
| uamb | 0 |
| uam | |
| uap | macOS |
| uapv | 26.1.0 |
| uaw | 0 |
| data | event=gtag.config |
| rfmt | 3 |
| fmt | 3 |
| is_vtc | 1 |
| cid | CAQSvwEA56J1ebNho-TwOkCVlEmxAN_5oFnhE4aa8FSKBJyaYpCpOIKT5mXPm8DJ5mKcfTIq4eAbZmq5LodLXC62m84yBg67Hf8ghZT6IdqVMGGyZQzjZHjtJYNuGkkFwyQ4EKt2uZnQDEJIBh066HkG7wpDnqJFlxPzEhmW_PITmM43JMldE3_Zs0_3M-xR8PLqtmi1ynbKmmC2nL0_4Pa_FhWGwKLJPIjZgJLkHthv9caeuU-FjygAdwciZ5sDNgBdDg |
| random | 3805364751 |
| rmt_tld | 0 |
| ipr | y |

CLASS ACTION COMPLAINT

(truncated for brevity.)

95.    Because Google's cookies operate across multiple sites (i.e., cross-site tracking), the cookies cause Google to track users as they navigate from one site to another, and to comprehensively observe and evaluate user behavior online. Google's advertising platform aggregates user data to create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics and audience segments based on shared traits (such as females, Millennials, Californians, etc.), and to perform targeted advertising and marketing analytics.

96.    Thus, the Google cookies used on the Websites cause Google to track users' interactions with advertisements to help advertisers understand how users engage with ads across different websites. Further, the user data collected through the cookie enables the delivery of

- 63 -

personalized ads based on user interests and behaviors. For instance, if a user frequently visits travel-related websites, Google will show her more travel-related advertisements. Further, the collected data is used to generate reports for advertisers, helping them assess the performance of their ad campaigns and make data-driven decisions (such as renaming their products). Further, Google's advertising platform enables advertisers to retarget marketing, which Google explains allows advertisers to "show previous visitors ads based on products or services they viewed on your website. With messages tailored to your audience, dynamic remarketing helps you build leads and sales by bringing previous visitors back to your website to complete what they started."[20]

97.     Further, in its "Shared Data Under Measurement Controller-Controller Data Protection Terms," Google states: "Google can access and analyze the Analytics data customers share with us to better understand online behavior and trends, and improve our products and services—for example, to improve Google search results, detect and remove invalid advertising traffic in Google Ads, and test algorithms and build models that power services like Google Analytics Intelligence that apply machine-learning to surface suggestions and insights for customers based on their analytics data and like Google Ads that applies broad models to improve ads personalization and relevance. These capabilities are critical to the value of the products we deliver to customers today."[21] Thus, Google can have the capability to use the data it collects for understanding online behavior and trends, machine learning, and improving its own products and services.

**4.    TikTok Cookies (Rao's and Pacific Foods Websites).**

98.     Defendants also cause third party cookies to be transmitted to and from Website users' browsers and devices on the Rao's and Pacific Foods Websites, even after users reject unnecessary cookies, to and from the **analytics.tiktok.com** domain. This domain is associated with TikTok for Business, a suite of tools offered by TikTok, a social media platform owned by ByteDance Ltd., known for short-form video sharing. The TikTok platform is used to create and

---

[20] Dynamic remarketing for web setup guide (available at https://support.google.com/google-ads/answer/6077124).
[21] Shared Data Under Measurement Controller-Controller Data Protection Terms (available at https://support.google.com/analytics/answer/9024351).

CLASS ACTION COMPLAINT

share videos, and it utilizes cookies for various purposes including assisting brands and marketers to create, manage, and optimize ad campaigns on the platform.[22]

99.     TikTok utilizes cookies to collect data on user interactions with websites that have integrated TikTok's tracking technologies (such as the Website). These cookies are used to "measure and improve the performance of your advertising campaigns and to personalize the user's experience (including ads) on TikTok."[23] TikTok further explains that it uses cookies to "match events with people who engage with your content on TikTok. Matched events are used to improve measurement and optimize ad campaigns. They can also contribute to building your retargeting and engagement audiences." *Id.* These cookies enable TikTok to recognize and track users across different sessions and domains (i.e., cross-site tracking) and to collect and synchronize user data to observe and evaluate TikTok user behavior.

100.    These cookies enable TikTok to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, including *email addresses and phone numbers*; (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) session information, (x) user identifiers, and (xi) geolocation data in the form of the IP address.[24]

101.    For example, the TikTok software code that Defendants cause to be stored on and executed by the Rao's Website user's device causes the user's search query for "sauce-test-string" to be sent to TikTok's domain after the user rejected all unnecessary cookies:

[22] *See, e.g.*, TikTok for Business (https://ads.tiktok.com/business/en-US/products/ads; and https://ads.tiktok.com/business/en-US/products/measurement); TikTok Business Help Center; Using Cookies with TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).
[23] TikTok Business Help Center; Using Cookies with TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).
[24] *Id.*; *see also* TikTok for Business: Enhance Data Postback with the TikTok Pixel (https://ads.tiktok.com/help/article/enhance-data-postback-with-the-tiktok-pixel?lang=en); TikTok for Business: Advanced Matching for Web (available at https://ads.tiktok.com/help/article/advanced-matching-web?redirected=1); TikTok for Business: About TikTok Pixel (available at https://ads.tiktok.com/help/article/tiktok-pixel?lang=en).

- 65 -
CLASS ACTION COMPLAINT

```
POST    200    https://analytics.tiktok.com/api/v2/pixel

Request  Header  Query  Body  Cookies  Raw | Summary  +           PLAIN ↕

1 ∨ {
2 ∨   "_inspection": {
3 ∨     "identity_params": {
4 ∨       "email_is_hashed": [
5             "empty_value"
6           ],
7 ∨         "phone_is_hashed": [
8             "empty_value"
9           ],
10 ∨        "sha256_email": [
11            "empty_value"
12          ],
13 ∨        "sha256_phone": [
14            "empty_value"
15          ],
16 ∨        "zip_code": [
17            "empty_value"
18          ]
19        },
20        "vids": "75571417"
21      },
22      "action": "Metadata",
23 ∨    "auto_collected_properties": {
24 ∨      "content_data": {
25          "json_ld": "[]",
26          "meta": "{\"title\":\"Marinara Sauce (24 oz.) by Rao's
            - Goldbelly\",\"meta:description\":\"Marinara Sauce
            (24 oz.) from Rao&#39;s shipped nationwide on
            Goldbelly. Shop 500+ food shops in America.\",
            \"meta:keywords\":\"goldbely, goldbelly, gourmet food,
            gourmet food gifts, food gifts, gift baskets,
            corporate gifts, foodie gifts, mail order food, order
            food, order bbq, order ice cream, order brownies, new
            york food, chicago food, new orleans food\"}",
```

CLASS ACTION COMPLAINT

"microdata": "[{\"dimensions\":{\"h\":1343,\"w\":597},
\"properties\":{\"image\":\"https://goldbelly.imgix.
net/uploads/showcase_media_asset/image/251858/
Rao_s_Advertising_Lifestyle_Marinara_24oz_February21_15
00x.png?ixlib=react-9.0.2&auto=format&ar=1%3A1\",
\"name\":\"MARINARA SAUCE (24 OZ.)\",\"price\":\"$9.
00\",\"description\":\"Bring home the famous taste of
Rao's Homemade® Marinara Sauce. Rao's Marinara Sauce
is a premium, carb-conscious pasta sauce made with
only the finest ingredients. Delicious speaks for
itself when enjoying this marinara sauce. Each batch
of Rao's Marinara Sauce is slow cooked in small
batches with high-quality ingredients. These wholesome
ingredients blend sweet Italian tomatoes, olive oil,
and onions with fresh basil, fresh garlic, oregano,
black pepper, and salt to create a pasta sauce that
br\"},\"subscopes\":[{\"dimensions\":{\"h\":15,
\"w\":271},\"properties\":{},\"subscopes\":
[{\"dimensions\":{\"h\":15,\"w\":135},\"properties\":
{\"position\":\"1\",\"item\":\"/\",
\"name\":\"Nationwide Shipping\"},\"subscopes\":[],
\"type\":\"http://schema.org/ListItem\"}],
\"type\":\"http://schema.org/BreadcrumbList\"}],
\"type\":\"http://data-vocabulary.org/Product\"}]",
"open_graph": "{\"og:site_name\":\"Rao's\",
\"twitter:site\":\"\",\"twitter:domain\":\"\",
\"og:title\":\"Marinara Sauce (24 oz.)\",
\"og:description\":\"Bring home the famous taste of
Rao's Homemade® Marinara Sauce. Rao's Marinara Sauce
is a premium, carb-conscious pasta sauce made with
only the finest ingredients. Delicious speaks for
itself when enjoying this marinara sauce. Each batch
of Rao's Marinara Sauce is slow cooked in small
batches with high-quality ingredients. These wholesome
ingredients blend sweet Italian tomatoes, olive oil,
and onions with fresh basil, fresh garlic, oregano,
black pepper, and salt to create a pasta sauce that
br\",\"og:url\":\"https://raos.goldbelly.com/
marinara-sauce-24-oz\",\"og:image\":\"https://
goldbelly.imgix.net/uploads/showcase_media_asset/image/
258806/Raos_Homemade_Marinara-Sauce-1.png?

Follow link (cmd + click)

CLASS ACTION COMPLAINT

```
          url_params=%7B%3Aw%3D%3E1200%2C%20%3Ah%3D%3E630%2C%20%3
          Afit%3D%3E%22crop%22%7D\",\"og:image:width\":\"1200\",
          \"og:image:height\":\"630\",\"og:type\":\"product\",
          \"og:price:amount\":\"9.0\",
          \"og:price:currency\":\"USD\",
          \"og:availability\":\"instock\",\"og:brand\":\"Rao's\",
          \"product:price\":\"9.0\",\"product:brand\":\"Rao's\",
          \"twitter:card\":\"\",\"twitter:title\":\"\",
          \"twitter:image:src\":\"\",\"twitter:data1\":\"\",
          \"twitter:label1\":\"\",\"twitter:data2\":\"\",
          \"twitter:label2\":\"\"}"
    },
    "page_trigger": "PageView"
  },
  "context": {
    "ad": {
      "jsb_status": 2,
      "sdk_env": "external"
    },
    "device": {
      "platform": "pc"
    },
    "index": 2,
    "library": {
      "name": "pixel.js",
      "version": "2.2.1"
    },
    "page": {
      "load_progress": "2",
      "referrer": "https://raos.goldbelly.com/search?
      q=sauce-test-string",
      "url": "https://raos.goldbelly.com/
      marinara-sauce-24-oz?ref=search"
    },
    "pageview_id":
    "c516197f-20b2-11f1-9230-0200170f1386-B6hBN.1.
    1::e6ca38ad-20b2-11f1-8619-b83fd2e30a22",
    "pixel": {
      "code": "CB7JFSBC77UEH0GNQS00",
      "codes": "CB7JFSBC77UEH0GNQS00",
      "runtime": "1"
```

CLASS ACTION COMPLAINT

```
        },
        "session_id":
        "c516197f-20b2-11f1-9230-0200170f1386::eRcEvcmKoctISHNSm-
        aS",
        "sessions": [
            {
                "csct": 1,
                "csid": "1773608761087::jSS8DX-b9yueJtMwFrfV",
                "page_csid": "1773608761087::2fjULbKvaErxK5ljjRvR",
                "pixel_code": "CB7JFSBC77UEH0GNQS00"
            }
        ],
        "user": {
            "anonymous_id": "01KKSN3XQXVRZNWYSQNTXZ9EBP_.tt.1",
            "external_id": "5ef6ac79-f548-4b74-a939-9974d41f83b9"
        },
        "userAgent": "Mozilla/5.0 (Macintosh; Intel Mac OS X
        10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/
        146.0.0.0 Safari/537.36",
        "variation_id": "traffic_4::default"
    },
    "event_id": "",
    "is_onsite": false,
    "limited_data_use": false,
    "message_id": "messageId-1773608828473-4518828370117",
    "partner": "Segment",
    "properties": {},
    "signal_diagnostic_labels": {
        "hashed_eb_email": {
            "label": "missing"
        },
        "hashed_eb_phone": {
            "label": "missing"
        },
        "hashed_email": {
            "label": "missing"
        },
        "hashed_phone": {
            "label": "missing"
        },
        "raw_auto_email": {
            "label": "missing"
```

- 69 -

CLASS ACTION COMPLAINT

```
93        },
94  ∨     "raw_auto_phone": {
95          "label": "missing"
96        },
97  ∨     "raw_eb_email": {
98          "label": "missing"
99        },
100 ∨     "raw_eb_phone": {
101         "label": "missing"
102       },
103 ∨     "raw_email": {
104 ∨       "abnormal_types": [
105           "empty"
106         ],
107         "label": "invalid"
108       },
109 ∨     "raw_phone": {
110         "label": "missing"
111       }
112     },
113     "timestamp": "2026-03-15T21:07:08.473Z"
114   }
```

102.    Although the data sent to TikTok indicates that the user clicked the button to reject all unnecessary cookies, sending this data has no effect on TikTok; the third party still records the user's behavior, just like any other button click. In other words, this data is not being sent to TikTok as part of an attempt to have TikTok stop intercepting user data.

103.    The "referrer" parameter above discloses the user's entire search query on the Rao's website to TikTok.

104.    The data includes the "session_id," which is a unique identifier generated by TikTok to track a user's activity. This allows TikTok to correlate the user's behavior from a browsing session, including page views and conversions, to a particular user to enhance advertising measurement, attribution, and targeting.[25]

105.    Along with this data, the TikTok software code that Defendants cause to be stored on and executed by the user's device causes various cookies to be sent to TikTok's domain:

---

[25] *See, e.g.*, How to get TikTok session id? (available at https://gbtimes.com/how-to-get-tiktok-session-id/).

- 70 -

CLASS ACTION COMPLAINT

106.    According to TikTok's documentation, the "_ttp" cookie is one of the company's advertising cookies, the purpose of which is "[t]o measure and improve the performance of your advertising campaigns and to personalize the user's experience (including ads) on TikTok."[26]

107.    Further, along with all of this data, the TikTok software code that Defendants cause to be stored on and executed by the user's device causes the user's "user-agent" information to be sent to TikTok:

108.    As discussed above with respect to Google, the "user-agent" corresponds to the device and browser that the user has used to access the Website.

109.    Finally, the data sent to TikTok includes the user's IP address—which can be used to determine a user's geolocation, including whether they are located in California.

110.    The same is true of the Pacfici Foods Website. For example, the following data was sent to TikTok as the user browsed the Pacific Foods Website:

---

[26] *See* TikTok for Business: Using Cookies with TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).

CLASS ACTION COMPLAINT

```
POST   200   https://analytics.tiktok.com/api/v2/pixel/act

Request Header Query Body Cookies Raw  Summary  +                    PLAIN ⌄

1 ⌄ {
2 ⌄     "_inspection": {
3           "inter_id": "1.-1178.0::169390.10.528.1361::151730.10.1337",
4           "ppf": [],
5           "vids": "75350340"
6       },
7       "action": "Click",
8 ⌄     "auto_collected_properties": {
9           "page_trigger": "Click",
10 ⌄        "trigger_element": {
11 ⌄            "attributes": {
12                 "class": "js-header-menu-toggleheader-regular__menu-toggle"
13             },
14             "inner_text": "Toggle Menu",
15             "num_child_buttons": 0,
16 ⌄          "position": {
17                 "x": 516,
18                 "y": 5
19             },
20             "tag": "BUTTON",
21             "timestamp": "2026-03-16T05:17:02.488Z",
22             "xpath": "/HTML/body[1]/header[1]/div[1]/button[1]"
23         }
24      },
25 ⌄    "context": {
26 ⌄        "ad": {
27             "jsb_status": 2,
28             "sdk_env": "external"
29         },
```

CLASS ACTION COMPLAINT

```
"device": {
  "platform": "pc"
},
"index": 0,
"library": {
  "name": "pixel.js",
  "version": "2.2.1"
},
"page": {
  "load_progress": "2",
  "referrer": "",
  "url": "https://www.pacificfoods.com/products/pacific-foods/
  organic-chicken-bone-broth-2/"
},
"pageview_id": "f89e79a5-20f6-11f1-be42-b83fd2f66886-7PgM-.0.
0::f89e4ab9-20f6-11f1-be42-b83fd2f66886",
"pixel": {
  "code": "CJHQBMBC77U2JVNG22BG",
  "codes": "CJHQBMBC77U2JVNG22BG",
  "runtime": "1"
},
"session_id":
"f89e79a5-20f6-11f1-be42-b83fd2f66886::njMtuj3JlYdeTnwbrxoi",
"sessions": [
  {
    "csct": 1,
    "csid": "1773638053097::lEbPV-nlpStFV0uk2t_l",
    "page_csid": "1773638053097::oB7e6RthzD-I_305213Z",
    "pixel_code": "CJHQBMBC77U2JVNG22BG"
  }
],
"user": {
  "anonymous_id": "01KKTH1V795E3J5M4ZB13W9PRF_.tt.1"
```

CLASS ACTION COMPLAINT

```
          },
          "userAgent": "Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7)
          AppleWebKit/537.36 (KHTML, like Gecko) Chrome/146.0.0.0 Safari/537.36"
          "variation_id": "traffic_2::default"
      },
      "event_id": "",
      "is_onsite": false,
      "message_id": "messageId-1773638222492-6205532215259",
      "partner": "Tealium",
      "properties": {},
      "signal_diagnostic_labels": {
        "hashed_eb_email": {
          "label": "missing"
        },
        "hashed_eb_phone": {
          "label": "missing"
        },
        "hashed_email": {
          "label": "missing"
        },
        "hashed_phone": {
          "label": "missing"
        },
        "raw_auto_email": {
          "label": "missing"
        },
        "raw_auto_phone": {
          "label": "missing"
        },
        "raw_eb_email": {
          "label": "missing"
        },
        "raw_eb_phone": {
          "label": "missing"
        },
        "raw_email": {
          "label": "missing"
        },
        "raw_phone": {
          "label": "missing"
        }
      },
      "timestamp": "2026-03-16T05:17:02.492Z"
}
```

CLASS ACTION COMPLAINT

111. By collecting this user data, TikTok performs user behavior tracking, i.e., monitoring user actions like page views, clicks, and interactions to understand user engagement; advertising optimization, i.e., gathering data to enhance the relevance and effectiveness of TikTok advertising campaigns; and performance measurement (i.e., assessing the success of marketing efforts by analyze user responses to ads and content).[27]

112. Further, TikTok's Automatic Advanced Matching feature functions as follows: "When a visitor lands on your website and inputs customer information during registration, sign-in, contact, or checkout on a website where you installed your pixel, Automatic Advanced Matching will capture information from those fields. …TikTok will use hashed information to link event information to people on TikTok. TikTok may use matched events to better attribute events to TikTok ads, optimize advertisers' future campaigns, and depending on advertisers' and users' settings, TikTok may also add people to advertisers' retargeting or engagement audiences."[28]

### 5. Additional Third-Party Cookies.

113. Some of the Websites also caused cookies to be sent to various additional third parties from users' browsers, even after users elected to opt-out of or reject all unnecessary cookies, to and from other domains, including the following shown in the chart below:

---

[27] *See* TikTok for Business: Using Cookies with TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).
[28] TikTok for Business: How to set up Automatic Advanced Matching (available at https://ads.tiktok.com/help/article/how-to-set-up-automatic-advanced-matching?lang=en).

| Examples of Third Party Domains that Receive Cookie Data From Users' Browsers After Rejecting All Cookies | Defendants' Websites that Cause Users' Browsers to Send the Unauthorized Data |
|---|---|
| addthis.com | Campbell's |
| adsrvr.org | Campbell's; Michael Angelo's |
| amazon-adsystem.com | Campbell's |
| analytics.yahoo.com | Campbell's |
| bat.bing.com | Rao's |
| ipredictive.com | Rao's |
| media6degrees.com | Campbell's |
| pinterest.com | Rao's |
| sharethrough.com | Campbell's |
| thebrighttag.com | Campbell's |
| trkn.us | Rao's |
| truoptik.com | Campbell's |
| twitter.com | Rao's |

114. Each of these third parties collect user data using cookies for analytical, social media, and/or advertising purposes.

115. For example, the **adsrvr.org** domain is associated with The Trade Desk, Inc., a digital advertising company that offers a cloud-based ad-buying platform that enables businesses to plan, manage, optimize, and measure data-driven digital advertising campaigns.[29] The Trade

---

[29] *See* The Trade Desk, Inc. 2023 Form 10-K (filed February, 15 2024).

CLASS ACTION COMPLAINT

Desk uses insight.adsrvr.org cookies to collect data on users such as their geographic locations, the type of device users are using, and users' interests as inferred from their web browsing or app usage activity."[30] This data helps The Trade Desk personalize ad content and track users across the internet.[31]

116.    The Trade Desk acknowledges that its cookies' ability "to collect, augment, analyze, use and share data relies upon the ability to uniquely identify devices across websites and applications, and to collect data about user interactions with those devices for purposes such as serving relevant ads and measuring the effectiveness of ads."[32]

117.    The **amazon-adsystem.com** domain is associated with Amazon's advertising services. Amazon utilizes cookies to collect data on user interactions with websites (including browsing behavior and preferences) to perform advertising and personalization functions, i.e., to assist Amazon in delivering advertisements tailored to user interests. Further, the cookies perform analytics functions to enable Amazon to measure and analyze the performance of its services and to ensure that ads are effective and relevant.

118.    The **analytics.yahoo.com** domain is owned by Yahoo Inc., a technology company that focuses on online media and advertising. Cookies set by the yahoo.com domain are used to target website users with advertising by assigning website users unique identifiers.[33] These cookies collect information, such as IP addresses, browser type and settings, operating system, device type, and advertising identifiers from other third parties, including Apple's ID for Advertising, Apple's ID for vendors, Google's Android ID, and Google's Play Store Ad ID.[34] Cookies are further used to support Yahoo's targeting of content and advertising and to associate users, devices, and accounts with each other or with those in a similar location, such as in the same household.[35] Yahoo's use of a unique identifier with its cookies allows it to track users

---

[30] *Id.*
[31] *Id.*
[32] *Id.*
[33] https://cookiepedia.co.uk/host/yahoo.com
[34] https://legal.yahoo.com/us/en/yahoo/privacy/topics/
cookies/index.html#:~:text=When%20you%20log%20in%20to,or%20device%20you%20are%20using.
[35] *Id.*

CLASS ACTION COMPLAINT

across the internet and across different devices.[36] The purpose of Yahoo Inc.'s cookies and the data they collect is to track users and target them with advertisements—the sale of which Yahoo uses to generate revenues.

119.    The webpage **bat.bing.com** is a host for Microsoft's Bing Ads Conversion tracking code.[37] The domain is associated with Bing, Microsoft's search engine, as well as Microsoft's digital advertising and analytics platforms. When a webpage loads a bat.bing.com cookie, it "tells Microsoft Advertising about the user visits to [the] webpage."[38] Microsoft uses bat.bing.com cookies to "record[] what customers do on [a] website and send[] that information to Microsoft Advertising." [39] Microsoft then serves targeted ads to web users across its extensive ad networks, which utilizes its "rich" supply of gathered data to "reach more than a billion people[.]"[40]

120.    Bat.bing.com cookies help Microsoft track users' interactions with ads (e.g., clicking a link or making a purchase) and provide valuable metrics that advertisers use to measure ad campaign performance. Further, bat.bing.com cookies allow Microsoft to obtain and store at user data to "help [website owners] focus a campaign or ad group on potential audiences who meet [website owners'] specific criteria, so [website owners] can increase the chance that [consumers] see [website owners'] ads." [41] Further, bat.bing.com offers [website owners] valuable "conversion tracking," which is a "measure [of] the ROI (return on investment) of your advertising campaign by letting [website owners] assign a monetary value to the activities people complete on [Defendant's] website after clicking [website owners'] ad."[42]

121.    Microsoft also utilizes bat.bing.com data for its own purposes, including by using the data to tailor content and target advertisements to users. This profile enables Microsoft to

---

[36] *Id.*

[37] https://answers.microsoft.com/en-us/msadvs/forum/all/does-batbing-track-your-browser-searches-and-sites/0a402f00-60c2-4d54-bd7d-81b67ccc7f13.

[38] https://help.ads.microsoft.com/apex/index/3/en/56959#:~:text=The%20most%20important%20request%20is,making%20when%20your%20webpage%20loads.

[39] https://help.ads.microsoft.com/#apex/ads/en/56960/1.

[40] https://answers.microsoft.com/en-us/msadvs/forum/all/opt-out-of-audience-ads/753bc0fc-c04f-4e20-a94a-abaa950ccf31#:~:text=When%20you%20come%20to%20Microsoft,and%20rich%20first%2Dparty%20data.

[41] https://help.ads.microsoft.com/#apex/ads/en/60212/0.

[42] https://help.ads.microsoft.com/#apex/ads/en/56680/2.

CLASS ACTION COMPLAINT

deliver highly targeted ads within Microsoft's extensive advertising network Microsoft's revenue from its advertising network program has exceeded $10 billion as of 2022.[43]

122.    The **pinterest.com** domain is associated with Pinterest, Inc., a popular social media platform that allows users to discover, save, and share ideas as pins in the form of photos and videos. Businesses can upload and showcase their products through "Shop the Look" pins or Product Pins that directly link to e-commerce websites. Businesses install the Pinterest tag on their websites to track ad conversions. As Pinterest explains, "The Pinterest tag is a piece of code that you add to your website. It lets Pinterest track visitors to your site, as well as the actions they take on your site after seeing your Pinterest ad. This means you can measure how effective your Pinterest ads are by understanding the actions people take on your website after seeing or engaging with your ad."[44] Pinterest cookies can be used to identify and track people who purchase products, add items to a shopping cart, visit specific pages on the website, and/or search for specific items on the website.[45]

123.    The **twitter.com** domain is associated with X Corp, formerly known as Twitter. X Corp's cookies collect a wide range of user data, including a user's browsing history; IP address; interactions with advertisements; data used to authenticate and secure personal accounts; and reading a device's local storage.[46] X Corp uses the collected user data to target users with personalized advertisements and content, generate analytics on website interaction, and to conduct unspecified "Research and Development."[47]

124.    These cookies allow these Third Parties to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) demographic information, (v) interests and preferences, (vi) shopping behaviors, (vii) device information, (viii) referring URLs, (ix) session information, (x) user identifiers, and/or (xi) geolocation data—

---

[43] https://digiday.com/media/microsofts-ad-revenue-hit-10b-and-its-investing-is-a-sleeping-giant-about-to-wake/.
[44] Pinterest Help Center: Install the Pinterest Tag (available at https://help.pinterest.com/en/business/article/install-the-pinterest-tag).
[45] *See, e.g.*, Pinterest Help Center: Add event codes (available at https://help.pinterest.com/en/business/article/add-event-codes); Pinterest Help Center: View tag parameters and cookies (available at https://help.pinterest.com/en/business/article/pinterest-tag-parameters-and-cookies).
[46] *See* https://help.x.com/en/rules-and-policies/x-cookies.
[47] *Id.*

CLASS ACTION COMPLAINT

which can be used to determine a user's geolocation, including whether they are located in California.

**D.     The Third Parties Intercept User Communications While in Transit.**

125.    On information and belief, the Third Parties intercept user communications while those communications are in transit from consumers' browsers to Defendants' Websites. The Third Parties operate large-scale data ingestion systems designed to receive, read, and act upon incoming data streams in real time, as the data is transmitted over the network, before it is committed to storage. As the user data is transmitted over the wire, it is transmitted as a raw payload that cannot be used until the Third Party reads and processes it using at least the steps described below. These steps necessarily require contemporaneous access to the contents of the communications while they are in transit.

126.    First, the Third Parties must read the data in real time in order to ***transform*** it into a usable format for subsequent processing. Transforming, for example, may involve converting long html-encoded strings and decoding them to a format such as Unicode Transformation Format, which is more amenable to subsequent processing.

127.    Second, the Third Parties read the data in real time in order to ***deduplicate*** events transmitted through multiple channels. Most websites transmit the same user interaction twice: both directly from the user's device and separately through a server-to-server API, to ensure reliability.[48] Third Party platforms encourage this redundant configuration and automatically compare identifiers contained within the transmitted data—such as event identifiers and device identifiers—to determine whether multiple transmissions correspond to the same user action.[49] This deduplication occurs as the communications are received, before they are stored.

---

[48] For example, Google's server-to-server API is the **Google Ads Conversion API**. Facebook's is the **Meta Conversions API**. TikTok uses the **TikTok Events API**. Pinterest uses the **Pinterest Conversions API**. On information and belief, each of the Third Parties uses a server-to-server API to collect user data.

[49] For example, Facebook recommends that websites use a "redundant setup" whereby "advertisers implement the Conversions API alongside their Meta Pixel." *See* "Handling Duplicate Pixel and Conversions API Events," available at https://developers.facebook.com/docs/marketing-api/conversions-api/deduplicate-pixel-and-server-events. Facebook confirms that its system automatically deduplicates events using various parameters included with the data, such as "event_id," "event_name," "fbp," and "external_id." *Id.*

CLASS ACTION COMPLAINT

128.    Third, the Third Parties read and analyze incoming communications in real time to *validate* and *filter* the data, including to detect invalid, malicious, or anomalous transmissions and to determine whether the data complies with internal processing rules. These determinations must be made immediately upon receipt of the communication in order for the Third Parties' systems to function.

129.    Fourth, the Third Parties perform real-time *analytics* on user communications to determine their meaning and significance. This processing is used to interpret the data, associate it with particular users or devices, and to determine what real-time events or actions should be taken in response, such as triggering advertising delivery, notifications, or other automated responses. This step typically involves applying artificial intelligence and machine learning algorithms to the data. These determinations occur while the data is in motion, prior to final storage.

130.    To accomplish each of the functions described above, the Third Parties employ real-time stream processing platforms specifically designed to operate on data "in flight"—that is, after it is transmitted from a user's browser but before it is committed to the Third Parties' storage. Examples of such platforms include Apache Flink, Kafka, and Amazon Kinesis. Industry documentation confirms that these systems are designed to read, transform, analyze, and act upon data streams as they are received.

131.    For example, Meta (formerly Facebook) has publicly described its proprietary real-time stream processing platform that ingests data transmitted from users' devices and websites, applies real-time transformations and personalization, and only thereafter stores the data in backend data warehouses, as illustrated in the following diagram created by Facebook:[50]

---

[50] XStream: Stream Processing Platform at Facebook (video) at 1:07 (available at https://www.youtube.com/watch?v=DNI54vc1ALQ).

- 81 -

CLASS ACTION COMPLAINT

As the diagram confirms, the data is sent from consumers' "Devices" and from the "Web," and then goes through the Stream Processing Pipelines *before* being stored in the data "Warehouse."

132.　Facebook's Stream Processing Pipelines perform a wide variety of real-time analytics, transformations, and AI and machine learning on the data prior to storage:[51]

---

[51] *Id.* at 2:05.

- 82 -

CLASS ACTION COMPLAINT

As the diagram confirms, Facebook does not merely store incoming data for later review; rather, before the data is stored, Facebook contemporaneously reads and processes it—including by reading the data, cleaning it, applying "real-time personalization" to associate it with a particular user, and analyzing its contents as necessary to generate real-time responses.

133.   On information and belief, the other Third Parties also use ingest-phase processing platforms that perform real-time analytics and filtering on incoming data streams before storage. For example, Google developed MillWheel, an internal stream processing system, as well as Flume/FlumeJava, which evolved into Google Cloud Dataflow.[52] Google Cloud Dataflow enables Google to perform many functions on real-time data at the "Ingest" phase, before it is stored.[53] Google, which sells Dataflow to third party developers for use with their own products, states that Dataflow is used "to create data pipelines that read from one or more sources, ***transform the data***, and write the data to a destination."[54] One use for Dataflow is the "[r]eal-time machine learning (ML) analysis of streaming data."[55] Google confirms that Dataflow is "suitable for more advanced applications, such as real-time streaming analytics."[56]

134.   Pinterest uses Apache Kafka, a third-party real-time stream processing platform.[57] The Kafka system streams events in real time to "many applications, such as native Kafka clients, Kafka Streams, Flink, and Spark streaming, which are consumers of a subset of Kafka topics that build several real-time pipelines."[58] These systems "include but are not limited to monetization, safety and spam detection, metrics processing, and experimentation use cases."[59]

---

[52] *See, e.g.*, Google Cloud Blog, "How cloud batch and stream data processing works" (August 2020), https://cloud.google.com/blog/products/data-analytics/how-cloud-batch-and-stream-data-processing-works.
[53] Google Cloud Blog, "BigQuery explained: An overview of BigQuery's architecture" (September 2, 2020), https://cloud.google.com/blog/products/data-analytics/new-blog-series-bigquery-explained-overview.
[54] Google Cloud Documentation, "Dataflow overview," https://docs.cloud.google.com/dataflow/docs/overview (emphasis added).
[55] *Id.*
[56] *Id.*
[57] Confluent, "Lessons Learned from Running Apache Kafka at Scale at Pinterest," https://www.confluent.io/blog/running-kafka-at-scale-at-pinterest/.
[58] *Id.*
[59] *Id.*

CLASS ACTION COMPLAINT

135.　Accordingly, the Third Parties' platforms do not operate as passive recipients that merely record user communications. Instead, they function as active interceptors that contemporaneously read and process the contents of user communications—including the Private Communications—by transforming, deduplicating, validating and filtering and analyzing in real time while those communications are in transit between the user's browser and Defendants' Websites.

**E.　The Signaling and Addressing Information Intercepted by the Third Parties.**

136.　The "signaling" and "addressing" information captured and recorded by the Third Parties includes TCP and/or UDP port numbers associated with outgoing communications initiated by Plaintiffs' and Class Members' browsers and devices. In the context of Internet Protocol (IP) networking, port numbers function as sub-addresses that direct traffic to specific software processes. By recording these port numbers, the Third Parties identify and distinguish specific network connections and the communicating endpoints involved (e.g., a Plaintiff's or Class Member's IP address and TCP/UDP source port communicating with a Third Party's destination IP address and destination port such as 443). These port numbers constitute addressing information associated with the communications initiated by Plaintiffs' and Class Members' browsers and devices and fall within the "instruments" and "facilities" contemplated by California Penal Code § 638.50(b).

137.　The "signaling" information also includes protocol-level metadata recorded by the Third Parties during connection establishment and session management, such as the initiation and acceptance of TCP connections and the TLS handshake and negotiation metadata used to establish HTTPS sessions. This signaling information is transmitted by Plaintiffs' and Class Members' devices to initiate, coordinate, and manage electronic communications with the Third Parties. Because this metadata enables management of the connection rather than the substance of the message, it constitutes record information regarding the characteristics of the communication, rather than communication content, and falls squarely within the statutory definition of a pen register.

- 84 -

138.    Additionally, the Third Parties record HTTP request header metadata, such as the "Host" header and connection-management headers (e.g., "Connection" in HTTP/1.1), which function as digital "dialing" information. Just as a traditional pen register records the number dialed to reach a destination, these headers identify the intended web origin (via "Host") and specify how the client requests the connection be handled for that request (e.g., whether to keep the connection open). This header information is transmitted as part of the Plaintiffs' and Website users' HTTP requests and, together with the destination network address and port, enables the receiving Third Party to identify and log the destination and handling characteristics of Plaintiffs' and Website users' communications, separate from any underlying user input or message content.

139.    Finally, the Third Parties' receiving infrastructure (e.g., servers, edge services, and/or load balancers) observes and records network-level and transport-level routing and addressing metadata associated with communications initiated by Plaintiffs' and Website users' browsers and devices. This metadata includes destination IP addresses, port identifiers (such as 443 for HTTPS), and related connection and session attributes, including connection initiation and termination timestamps, connection duration, and identifiers such as the protocol used (TCP or UDP), the source IP address, the source port, the destination IP address, and the destination port. The Third Parties use this information in real time to identify and log the origin and destination endpoints of Plaintiffs' and Website users' electronic communications and the characteristics of those connections, separate from any substantive "message" or "contents" carried at the higher-level Application layer.

F.    **The Private Communications Collected are Valuable.**

115.    As part of its regular course of business, Defendants target California consumers by causing the Third Parties to extract, collect, maintain, distribute, and exploit for Defendants' and the Third Parties' profit, all of the Private Communications transferred by the cookies which Defendants cause to be placed on Plaintiffs' and other California Website users' devices without their knowledge or consent. Defendants knew the location of consumers like Plaintiffs and the

Class members either prior to or shortly after causing the Third Parties to use cookies on their devices.

116. The Private Communications tracked and collected through cookies on the Websites are valuable to Defendants and the Third Parties. Defendants use this data to measure and optimize marketing campaigns, evaluate website design and product placement, and target specific users or groups of users with advertising. For example, Defendants can identify California users who visit webpages related to particular food products to consumers and then target those users with advertisements for similar products both on the Websites and across unrelated third-party websites.

117. Data reflecting users' browsing activity allows Defendants to identify behavioral patterns, preferences, and interests relating to Defendants' products. At scale, this data enables Defendants to assess trends across its brands and within the broader consumer food products market. Defendants monetize this data by leveraging it to increase user engagement, advertising effectiveness, and overall revenue.

118. The value of the Private Communications tracked and collected by the Third Parties using cookies on the Websites can be quantified. Legal scholars observe that "[p]ersonal information is an important currency in the new millennium."[60] Indeed, "[t]he monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend." *Id*. "Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information." *Id*.

119. Numerous empirical studies quantify the appropriate value measure for personal data. Generally, the value of personal data is measured as either the consumer's willingness to accept compensation to sell her data or the consumer's willingness to pay to protect her information.

120. By falsely representing consumers' ability to opt-out of or reject unnecessary cookies, and by aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties to collect users' Private Communications, Defendants unjustly enriches themselves at the

---

[60] *See* Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 Harv. L. Rev. 2055, 2056–57 (2004).

CLASS ACTION COMPLAINT

expense of consumer privacy and autonomy. Defendants deprive consumers of the ability to decide whether, and on what terms, their data may be monetized.

<strong><u>PLAINTIFFS' EXPERIENCES</u></strong>

**<u>Plaintiff Gail Spears</u>**

121.    Plaintiff Spears visited the Campbell's Website on one or more occasions during the last four years to seek information about Campbell's products.

122.    Plaintiff Spears' visits to the Campbell's Website were consistent with an ordinary Website user's visits seeking information about Defendant Campbell's products. Specifically, Plaintiff Spears is not a consumer advocate, a "tester," or a compliance auditor that visited the Website to test or evaluate Defendant Campbell's privacy practices.

123.    When Plaintiff Spears visited the Campbell's Website, it immediately presented her with the Website's popup cookie consent banner, which provided the option to select the "Options" button. Plaintiff Spears viewed Campbell's representation on the popup cookie consent banner that, "We use cookies to personalize and enhance your experience on our site. Visit our Privacy Policy to learn more and manage your preferences via our Your Choices tool." Plaintiff Spears also viewed Campbell's additional representation that, rather than agreeing to or accepting cookies, users could instead manage their preferences" by clicking the "Options" button.

124.    Plaintiff Spears selected and clicked the "Options" button, which caused Campbell's "Your Privacy Choices" window to appear. There, Plaintiff Spears viewed Campbell's additional representations that, "We may collect and share your personal information via cookies or similar technologies with third parties who help us better understand your behavior and browsing activities in order to, for example, personalize your online experience, serve you targeted advertising (referred to as 'interest-based advertising') or provide us with analytics services." Plaintiff Spears also viewed Defendant Campbell's representation that users could "opt-out of their use of such cookies," either by selecting the appropriate toggle switches, or selecting the "Opt-Out All" button.

125.    Accordingly, Plaintiff Spears selected and clicked the "Opt-Out All" button, then

- 87 -

the "Save Preferences" button, and continued browsing the Campbell's Website. Plaintiff Spears believed that selecting the "Opt-Out All" button on the Your Privacy Choices window found on the Campbell's Website would allow her to opt-out of and/or reject all unnecessary cookies and other tracking technologies (inclusive of those cookies that cause the disclosure of tracking data to third-party advertising networks, analytics services, and/or other companies for the purposes of providing personalized content, advertising, and analytics).

126. In selecting the "Opt-Out All" button, Plaintiff Spears gave Defendant Campbell's notice that she did not consent to the use or placement of cookies and tracking technologies while browsing the Campbell's Website. Further, Plaintiff Spears specifically rejected, based on Defendant Campbell's representations, those cookies used to "personalize your online experience, serve you targeted advertising…or provide us with analytics services" and share information with third parties. In reliance on these representations and promises, only then did Plaintiff Spears continue browsing the Campbell's Website.

127. Even before the popup cookie consent banner appeared on the screen, Defendant Campbell's nonetheless caused cookies and tracking technologies, including those used for personalized content and advertising, social media features, and analytics, to be placed on Plaintiff Spears' device and/or transmitted to the Third Parties along with user data, without her knowledge. Accordingly, the popup cookie consent banner and Your Choice tool's representations to Plaintiff Spears that she could reject the use and/or placement of all unnecessary cookies and tracking technologies while she browsed the Campbell's Website were false. Contrary to what Defendant Campbell's made Plaintiff Spears believe, she did not have a choice about whether third-party cookies would be placed on her device and/or transmitted to the Third Parties along with her user data; rather, Defendant Campbell's had already caused that to happen.

128. Then, as Plaintiff Spears continued to browse the Campbell's Website in reliance on the promises Defendant Campbell's made in the cookie consent banner and Your Privacy Choices window, and despite Plaintiff Spears' clear rejection of the use and/or placement of such cookies and tracking technologies, Defendant Campbell's nonetheless continued to cause the

- 88 -

CLASS ACTION COMPLAINT

placement and/or transmission of cookies along with user data, including those involved in providing personalized content, advertising, social media features, and analytics from the Third Parties on her device. In doing so, Defendant Campbell's permitted the Third Parties to track and collect Plaintiff Spears' Private Communications as she browsed the Campbell's Website.

129. Defendant Campbell's representations that consumers could opt-out of unnecessary cookies while Plaintiff Spears and users browsed the Campbell's Website, or at least opt out of or reject those involved in providing personalized content, advertising, social media features, and analytics, were untrue. Had Plaintiff Spears known this fact, she would not have used the Campbell's Website. Moreover, Plaintiff Spears reviewed the popup cookie consent banner and Your Privacy Choices window prior to using the Campbell's Website. Had Defendant Campbell's disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to opt-out of or reject all unnecessary cookies, Plaintiff Spears would have noticed it and would not have used the Campbell's Website or, at a minimum, she would have interacted with the Campbell's Website differently.

130. Plaintiff Spears continues to desire to browse content featured on the Websites. Plaintiff Spears would like to browse websites that do not misrepresent that users can opt-out of or reject all unnecessary cookies and tracking technologies. If the Websites were programmed to honor users' requests to opt-out of or reject all unnecessary cookies and tracking technologies, Plaintiff Spears would likely browse the Website again in the future, but will not do so until then. Plaintiff Spears regularly visits websites that feature content similar to that of the Websites. Because Plaintiff Spears does not know how the Websites are programmed, which can change over time, and because she does not have the technical knowledge necessary to test whether the Websites honor users' requests to reject all unnecessary cookies and tracking technologies, Plaintiff Spears will be unable to rely on Defendants' representations when browsing the Websites in the future absent an injunction that prohibits Defendants from making misrepresentations on the Websites. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools.

CLASS ACTION COMPLAINT

As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Spears is not a software developer and has not received training with respect to HTTP network calls.

**Plaintiff Revital Yogev**

131.    Plaintiff Yogev visited the Campbell's, Bolthouse, Rao's, and Pacific Foods Websites on one or more occasions during the last four years to seek information about Defendants' products. During those visits, Plaintiff Yogev navigated the Websites both by clicking on links and by using the Websites' search bar tools to search for products of interest.

132.    Plaintiff Yogev's visits to the Websites were consistent with an ordinary Website user's visits seeking information about Defendants' products. Specifically, Plaintiff Yogev is not a consumer advocate, a "tester," or a compliance auditor that visited the Website to test or evaluate Defendants' privacy practices.

133.    When Plaintiff Yogev visited the Websites, each immediately detected that she was a visitor in California and presented her with the Website's popup cookie consent banner, which provided the option to select the "Use necessary cookies only" (for the Bolthouse Website) or "Strictly Necessary Cookies Only" for the Campbell's, Rao's, and Pacific Foods Websites.

134.    Plaintiff Yogev viewed Defendants' representations on the Campbell's, Rao's, and Pacific Foods Websites' popup cookie consent banners that, "This website uses cookies (not the edible kind!) and similar technologies to operate, analyze and improve the functionality of our websites and to assist in our marketing efforts. Some cookies are necessary for our websites to function properly." Plaintiff Yogev also viewed Defendants' additional representations that, rather than agreeing to or accepting all cookies, users could instead accept "Strictly Necessary Cookies Only." Plaintiff Yogev selected and clicked the "Strictly Necessary Cookies Only" button on the Rao's and Pacific Foods Websites, which caused the cookie consent banner to disappear, and continued browsing the Rao's and Pacific Foods Websites.

135.    Plaintiff Yogev also viewed Defendant Bolthouse's representations on the

CLASS ACTION COMPLAINT

Bolthouse Website's popup cookie consent banner that, "We use cookies to personalise content and ads, to provide social media features and to analyse our traffic. We also share information about your use of our site with our social media, advertising and analytics partners who may combine it with other information that you've provided to them or that they've collected from your use of their services." Plaintiff Yogev also viewed Defendant Bolthouse's additional representation that, rather than agreeing to or accepting all cookies, users could instead "Use necessary cookies only." Plaintiff Yogev selected and clicked the "Use necessary cookies only" button on the Bolthouse Website, which caused the cookie consent banner to disappear, and continued browsing the Bolthouse Website.

136.    Plaintiff Yogev believed that selecting the "Strictly Necessary Cookies Only" button on the Campell's, Rao's and Pacific Foods Websites and the "Use necessary cookies only" button on the Bolthouse Website would allow her to reject all unnecessary cookies and other tracking technologies (inclusive of those cookies that cause the disclosure of tracking data to third-party advertising networks, analytics services, and/or other companies for the purposes of providing personalized content, advertising, and analytics) used on the Websites.

137.    In selecting the "Strictly Necessary Cookies Only" and the "Use necessary cookies only" buttons on the respective Websites, Plaintiff Yogev gave Defendants notice that she did not consent to the use or placement of cookies and tracking technologies while browsing the Websites. Further, Plaintiff Yogev specifically rejected, based on Defendants' representations, those cookies used to for targeted advertising or analytics services and those that share information with third parties. In reliance on these representations and promises, only then did Plaintiff Yogev continue browsing the Websites.

138.    Even before the popup cookie consent banners appeared on the screen, Defendants nonetheless caused cookies and tracking technologies, including those used for personalized content, advertising, and analytics, to be placed on Plaintiff Yogev's device and/or transmitted to the Third Parties along with user data, without her knowledge. Accordingly, the popup cookie consent banners' representations to Plaintiff Yogev that she could reject the use and/or placement of all unnecessary cookies and tracking technologies while she browsed the

- 91 -

CLASS ACTION COMPLAINT

Websites were false. Contrary to what Defendants made Plaintiff Yogev believe, she did not have a choice about whether third-party cookies would be placed on her device and/or transmitted to the Third Parties along with her user data; rather, Defendants had already caused that to happen.

139.    Then, as Plaintiff Yogev continued to browse the Websites in reliance on the promises Defendants made in the cookie consent banners, and despite Plaintiff Yogev's clear rejection of the use and/or placement of such cookies and tracking technologies, Defendants nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing personalized content, advertising, and analytics from the Third Parties on her device. In doing so, Defendants permitted the Third Parties to track and collect Plaintiff Yogev's Private Communications as she browsed the Websites.

140.    Defendants' representations that consumers could opt-out of or reject unnecessary cookies while Plaintiff Yogev and users browsed the Websites, or at least those involved in providing personalized content, targeted or interest-based advertising, and analytics services, were untrue. Had Plaintiff Yogev known this fact, she would not have used the Websites. Moreover, Plaintiff Yogev reviewed the Websites' popup cookie consent banners prior to using the Websites. Had Defendants disclosed that they would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to reject all unnecessary cookies, Plaintiff Yogev would have noticed it and would not have used the Websites or, at a minimum, she would have interacted with the Websites differently.

141.    Plaintiff Yogev continues to desire to browse content featured on the Websites. Plaintiff Yogev would like to browse websites that do not misrepresent that users can opt-out of or reject all unnecessary cookies and tracking technologies. If the Websites were programmed to honor users' requests to opt-out of or reject all unnecessary cookies and tracking technologies, Plaintiff Yogev would likely browse the Websites again in the future, but will not do so until then. Plaintiff Yogev regularly visits websites that feature content similar to that of the Websites. Because Plaintiff Yogev does not know how the Websites are programmed, which can change over time, and because she does not have the technical knowledge necessary to test whether the

- 92 -

Websites honor users' requests to opt-out of or reject all unnecessary cookies and tracking technologies, Plaintiff Yogev will be unable to rely on Defendants' representations when browsing the Websites in the future absent an injunction that prohibits Defendants from making misrepresentations on the Websites. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Yogev is not a software developer and has not received training with respect to HTTP network calls.

## CLASS ALLEGATIONS

142. Plaintiffs bring this Class Action Complaint on behalf of themselves and a proposed class of similarly situated persons, pursuant to Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Plaintiffs seek to represent the following group of similarly situated persons, defined as follows:

> **Class**: All persons who browsed any of the Websites in the State of California after clicking or selecting the: (i) "Opt-Out All" button in the Your Privacy Choices window on the Campbell's Website, (ii) "Use necessary cookies only" button in the popup cookies consent banner on the Bolthouse Website, or (iii) "Strictly Necessary Cookies Only" button in the popup cookies consent banner on the Campbell's, Rao's, Pacific Foods and/or Michael Angelos Websites.

143. This action has been brought and may properly be maintained as a class action against Defendants because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

144. **Numerosity:** Plaintiffs do not know the exact size of the Class, but they estimate that it is composed of more than 100 persons. The persons in the Class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

145. **Common Questions Predominate:** This action involves common questions of law and fact to the Class because each class member's claim derives from the same unlawful

conduct that led them to believe that Defendants would not cause third-party cookies to be placed on their browsers and devices and/or transmitted to third parties along with user data, after Class members chose to opt-out of or reject all unnecessary cookies and tracking technologies on the Websites, nor would Defendants permit third parties to track and collect Class members' Private Communications as Class members browsed the Websites.

146.    The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Class to recover. The questions of law and fact common to the Class are:

        a.    Whether Defendants' actions violate California laws invoked herein; and

        b.    Whether Plaintiffs and Class members are entitled to damages, restitution, injunctive and other equitable relief, reasonable attorneys' fees, prejudgment interest and costs of this suit.

147.    **Typicality:** Plaintiffs' claims are typical of the claims of the other members of the Class because, among other things, Plaintiffs, like the other Class members, visited the Websites, opted out of or rejected all unnecessary cookies, and had their confidential Private Communications intercepted by the Third Parties.

148.    **Adequacy of Representation:** Plaintiffs will fairly and adequately protect the interests of all Class members because it is in their best interests to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complain. Plaintiffs also have no interest in conflict with, or antagonistic to, the interests of Class members. Plaintiffs have retained highly competent and experienced class action attorneys to represent their interests and those of the Class. By prevailing on their claims, Plaintiffs will establish Defendants' liability to all Class members. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to the Class members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for Class members.

CLASS ACTION COMPLAINT

149.   **Superiority:** There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for Defendants and result in the impairment of Class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the Class may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### First Cause of Action: Invasion of Privacy

150.   Plaintiffs reallege and incorporate the paragraphs of this Complaint as if set forth herein.

151.   To plead an invasion of privacy claim, Plaintiffs must show an invasion of (i) a legally protected privacy interest; (ii) where Plaintiffs had a reasonable expectation of privacy in the circumstances; and (iii) conduct by Defendants constituting a serious invasion of privacy.

152.   Defendants have intruded upon the following legally protected privacy interests of Plaintiffs and Class members: (i) the California Invasion of Privacy Act, as alleged herein; (ii) the California Constitution, which guarantees Californians the right to privacy; (iii) the California Wiretap Acts as alleged herein; (iv) Cal. Penal Code § 484(a), which prohibits the knowing theft or defrauding of property "by any false or fraudulent representation or pretense;" and (v) Plaintiffs' and Class members' Fourth Amendment right to privacy.

153.   Plaintiffs and Class members had a reasonable expectation of privacy under the circumstances, as Defendants affirmatively promised users they could opt-out of or reject all

unnecessary cookies and tracking technologies before proceeding to browse the Websites. Plaintiffs and other Class members directed their electronic devices to access the Websites and, when presented with the popup cookies consent banner or Your Privacy Choices window on the Websites, Plaintiffs and Class members opted out of or rejected all unnecessary cookies and reasonably expected that their choice to opt-out of or reject all such cookies and tracking technologies would be honored. That is, they reasonably believed that Defendants would not permit the Third Parties to store and send cookies and/or use other such tracking technologies on their devices while they browsed the Websites. Plaintiffs and Class members also reasonably expected that, if they opted out of or rejected such cookies and/or tracking technologies, Defendants would not permit the Third Parties to track and collect Plaintiffs' and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, on the Websites.

154. Such information is "personal information" under California law, which defines personal information as including "Internet or other electronic network activity information," such as "browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement." Cal. Civ. Code § 1798.140.

155. Defendants, in violation of Plaintiffs' and other Class members' reasonable expectation of privacy and without their consent, permits the Third Parties to use cookies and other tracking technologies to collect, track, and compile users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California. The data that Defendants allowed third parties to collect enables the Third Parties to, (and they in fact do), *inter alia*, create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; create audience segments based on shared traits (such as Millennials, Californians, tech enthusiasts, etc.); and

- 96 -
CLASS ACTION COMPLAINT

perform targeted advertising and marketing analytics. Further, the Third Parties share user data and/or the user profiles to unknown parties to further their financial gain. The consumer profiles are and can be used to further invade Plaintiffs' and users' privacy, by allowing third parties to learn intimate details of their lives, and target them for advertising and other purposes, as described herein, thereby harming them through the abrogation of their autonomy and their ability to control dissemination and use of information about them.

156. Defendants' actions constituted a serious invasion of privacy in that they invaded a zone of privacy protected by the Fourth Amendment (i.e., one's personal communications), and violated criminal laws on wiretapping and invasion of privacy. These acts constitute an egregious breach of social norms that is highly offensive.

157. Defendants' intrusion into Plaintiffs' privacy was also highly offensive to a reasonable person.

158. Defendants lacked a legitimate business interest in causing the placement and/or transmission of third-party cookies along with user data that allowed the Third Parties to track, intercept, receive, and collect Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, without their consent.

159. Plaintiffs and Class members have been damaged by Defendants' invasion of their privacy and are entitled to just compensation, including monetary damages.

160. Plaintiffs and Class members seek appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendants as a result of their intrusions upon Plaintiffs' and Class members' privacy.

161. Plaintiffs and Class members seek punitive damages because Defendants' actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' choice to opt-out of or reject the Websites' use of unnecessary

- 97 -

CLASS ACTION COMPLAINT

cookies. Punitive damages are warranted to deter Defendants from engaging in future misconduct.

### Second Cause of Action: Intrusion Upon Seclusion

162. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

163. To assert a claim for intrusion upon seclusion, Plaintiffs must plead (i) that Defendants intentionally intruded into a place, conversation, or matter as to which Plaintiffs had a reasonable expectation of privacy; and (ii) that the intrusion was highly offensive to a reasonable person.

164. By permitting third-party cookies to be stored on consumers' devices without consent, which caused the Third Parties to track and collect Plaintiffs' and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, in violation of Defendants' representations otherwise in the popup cookie consent banner, Defendants intentionally intruded upon the solitude or seclusion of the Websites' users. Defendants effectively placed the Third Parties in the middle of communications to which they were not invited, welcomed, or authorized.

165. The Third Parties' tracking and collecting of Plaintiffs' and Class member's Private Communications on the Websites using third-party cookies that Defendants caused to be stored on users' devices—and to be transmitted to Third Parties—was not authorized by Plaintiffs and Class members, and, in fact, those Websites' users specifically chose to opt-out of or reject all unnecessary cookies.

166. Plaintiffs and the Class members had an objectively reasonable expectation of privacy surrounding their Private Communications on the Websites based on Defendants' promise that users could opt-out of or reject all unnecessary cookies, as well as state criminal and civil laws designed to protect individual privacy.

167. Defendants' intentional intrusion into Plaintiffs' and other users' Private Communications would be highly offensive to a reasonable person given that Defendants

represented that their Websites' users could opt-out of or reject all unnecessary cookies when, in fact, Defendants caused such third-party cookies to be stored on consumers' devices and browsers, and to be transmitted to third parties, even when consumers opted out of or rejected all such cookies. Indeed, Plaintiffs and Class members reasonably expected, based on Defendants' false representations, that when they opted out of or rejected all unnecessary cookies and tracking technologies, Defendants would not cause such third-party cookies to be stored on their devices or permit the Third Parties to obtain their Private Communications on the Websites, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

168. Defendants' conduct was intentional and intruded on Plaintiffs' and users' Private Communications on the Websites.

169. Plaintiffs and Class members have been damaged by Defendants' invasion of their privacy and are entitled to just compensation, including monetary damages.

170. Plaintiffs and Class members seek appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendants as a result of their intrusions upon Plaintiffs' and Class members' privacy.

171. Plaintiffs and Class members seek punitive damages because Defendants' actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' choice to opt-out of or reject the Websites' use of all unnecessary cookies. Punitive damages are warranted to deter Defendants from engaging in future misconduct.

**Third Cause of Action: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631)**

172. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

- 99 -
CLASS ACTION COMPLAINT

173. California Penal Code § 631(a) provides, in pertinent part:

"Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars . . . ."

174. The California Supreme Court has repeatedly stated an "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line permits an outsider to tap his telephone or listen in on the call." *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added).

175. Further, as the California Supreme Court has held, in explaining the legislative purpose behind CIPA:

While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and *its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*

As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication— the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas*, 38 Cal. 3d at 360-61 (emphasis supplied; internal citations omitted).

176. CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under § 631(a), Plaintiffs need only establish that Defendant, "by means of any machine, instrument, contrivance, or in any other manner," did *any* of the following:

[i] Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system;

[ii] Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or

- 100 -

CLASS ACTION COMPLAINT

passing over any wire, line or cable or is being sent from or received at any place within this state;

[iii] Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained

Cal. Penal Code § 631(a).

177.   CIPA § 631(a) also penalizes those who [iv] "aid[], agree[] with, employ[], or conspire[] with any person" who conducts the aforementioned wiretapping, or those who "permit" the wiretapping.

178.   Each of the Defendants is a "person" within the meaning of California Penal Code § 631.

179.   Section 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Bradley v. Google, Inc.*, 2006 WL 3798134, at *5–6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

180.   The Third Parties' cookies—as well as the software code of the Third Parties responsible for placing the cookies and transmitting data from user devices to the Third Parties—constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA (and, even if they do not, Defendants' deliberate and purposeful scheme that facilitated the interceptions falls under the broad statutory catch-all category of "any other manner").

181.   Each of the Third Parties is a "separate legal entity that offers [a] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Further, the Third Parties had the capability to use the wiretapped information for their own purposes and, as alleged above, they did in fact use the wiretapped information for their own business purposes. Accordingly, the Third Parties were third parties to any communication between Plaintiffs and Class members, on the one hand, and Defendants, on the

other. *Id.* at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

182.    Under § 631(a), Defendants must show they had the consent of all parties to a communication.

183.    At all relevant times, the Websites caused Plaintiffs and Class members' browsers to store the Third Parties' cookies and to transmit those cookies alongside Private Communications—including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—to the Third Parties without Plaintiffs' and Class members' consent. By configuring the Websites in this manner, Defendants willfully aided, agreed with, employed, permitted, or otherwise enabled the Third Parties to wiretap Plaintiffs and Class members using the Third Parties' cookies and to accomplish the wrongful conduct alleged herein.

184.    At all relevant times, by their cookies and corresponding software code, the Third Parties willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiffs and Class members, on the one hand, and Defendants, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

185.    The Private Communications of Plaintiffs and Class members, on the one hand, and Defendants, on the other, that the Third Parties automatically intercepted directly communicates the Websites' users' affirmative decisions, actions, choices, preferences, and activities, which constitute the "contents" of electronic communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

CLASS ACTION COMPLAINT

186. At all relevant times, the Third Parties used or attempted to use the Private Communications automatically intercepted by their cookie tracking technologies for their own purposes.

187. Plaintiffs and Class members did not provide their prior consent to the Third Parties' intentional access, interception, reading, learning, recording, collection, and usage of Plaintiffs' and Class members' electronic communications. Nor did Plaintiffs and Class members provide their prior consent to Defendants' aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties' conduct. On the contrary, Plaintiffs and Class members expressly declined to allow Third Parties' cookies and tracking technologies to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic communications by choosing to opt-out of or reject all unnecessary cookies.

188. The wiretapping of Plaintiffs and Class members occurred in California, where Plaintiffs and Class members accessed the Websites and where the Third Parties—as caused by Defendants—routed Plaintiffs' and Class members' electronic communications to Third Parties' servers. Among other things, the cookies, as well as the software code responsible for placing the cookies and transmitting them and other Private Communications to the Third Parties, resided on Plaintiffs' California-located device. In particular, the users' California-based device, after downloading the software code from the Third Parties' servers, (i) stored the code onto the user's disk; (ii) converted the code into machine-executable format; and (iii) executed the code, causing the transmission of data (including cookie data) to and from the Third Parties.

189. Plaintiffs and Class members have suffered loss by reason of these violations, including, but not limited to, (i) violation of their right to privacy, (ii) loss of value in their Private Communications, (iii) damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their Private Communications, and (iv) loss of their Private Communications to the Third Parties with no consent.

190. Pursuant to California Penal Code § 637.2, Plaintiffs and Class members have been injured by the violations of California Penal Code § 631, and each seek statutory damages

CLASS ACTION COMPLAINT

of the greater of $5,000, or three times the amount of actual damages, for each of Defendants' violations of CIPA § 631(a), as well as injunctive relief.

191.    Unless enjoined, Defendants will continue to commit the illegal acts alleged herein including, but not limited to, permitting third parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendants. Plaintiffs, Class members, and the general public continue to be at risk because Plaintiffs, Class members, and the general public frequently use the internet to search for information and content related to food and beverage products. Plaintiffs, Class members, and the general public continue to desire to use the internet for that purpose. Plaintiffs, Class members, and the general public have no practical way to know if their request to opt-out of or reject all unnecessary cookies and tracking technologies will be honored and/or whether Defendants will permit third parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendants. Further, Defendants have already permitted the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendants and will continue to do so unless and until enjoined.

**Fourth Cause of Action: Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51)**

192.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

193.    The California Invasion of Privacy Act, codified at Cal. Penal Code §§ 630 to 638, includes the following statement of purpose:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

194.    California Penal Code Section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

- 104 -
CLASS ACTION COMPLAINT

195. A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

196. The Third Parties' cookies and the corresponding software code installed by Defendants on their Websites are each "pen registers" because they are "device[s] or process[es]" that "capture[d]" the "routing, addressing, or signaling information"—including, the IP address and user-agent information—from the electronic communications transmitted by Plaintiffs' and the Class's computers or devices. Cal. Penal Code § 638.50(b).

197. At all relevant times, Defendant caused pen registers (e.g., the Third Party software code and cookies) to be placed on Plaintiffs' and Class members' browsers and devices. This software code established and maintained network connections between the users' devices and the Third Parties, and also caused cookies, user data and metadata, and addressing and networking information (including, without limitation, IP addresses, port numbers, protocol-level metadata, HTTP request header metadata, and and user-agent information), to be transmitted to the Third Parties. *See Greenley v. Kochava,* 2023 WL 4833466, at *15-16 (S.D. Cal. July 27, 2023); *Shah v. Fandom, Inc.*, 2024 U.S. Dist. LEXIS 193032, at *5-11 (N.D. Cal. Oct. 21, 2024).

198. Some of the information collected by the Third Parties' cookies and the corresponding software, including IP addresses and user-agent information, does not constitute the content of Plaintiffs' and the Class members' electronic communications with the Websites. *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1008 (9th Cir. 2014). ("IP addresses constitute addressing information and do not necessarily reveal any more about the underlying contents of communication…") (cleaned up).

199. Plaintiffs and Class members did not provide their prior consent to Defendants' use of third-party cookies and the corresponding software. On the contrary, Plaintiffs and the Class members informed Defendants that they did not consent to the Websites' use of third-party

- 105 -
CLASS ACTION COMPLAINT

cookies by clicking or selecting the "Use necessary cookies only," "Strictly Necessary Cookies Only," and/or "Opt-Out All" buttons on the respective Websites.

200. Defendants did not obtain a court order to install or use the third-party cookies and corresponding software to track and collect Plaintiffs' and Class member's IP addresses and user-agent information.

201. As a direct and proximate result of Defendants' conduct, Plaintiffs and Class members suffered losses and were damaged in an amount to be determined at trial.

202. Pursuant to Penal Code § 637.2(a)(1), Plaintiffs and Class members are also entitled to statutory damages of $5,000 for each of Defendants' violations of § 638.51(a).

**Fifth Cause of Action: Common Law Fraud, Deceit and/or Misrepresentation**

203. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

204. Defendants fraudulently and deceptively informed Plaintiffs and Class members that they could opt-out of or reject all unnecessary cookies on the Websites.

205. However, despite Defendants' representations otherwise, Defendants caused third-party cookies and software code to be stored on consumers' devices, and to be transmitted to the Third Parties alongside Private Communications, even after users clicked or selected "Use necessary cookies only," "Strictly Necessary Cookies Only," and/or "Opt-Out All" buttons on the respective Websites. These cookies and corresponding software code allowed the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' Private Communications, even when consumers had previously chosen to opt-out of or reject all such unnecessary cookies.

206. These misrepresentations and omissions were known exclusively to, and actively concealed by Defendants, not reasonably known to Plaintiffs and Class members, and material at the time they were made. Defendants knew, or should have known, how the Websites functioned, including the Third Party's resources it installed on the Websites and the third-party cookies in use on the Websites, through testing the Websites, evaluating its performance metrics by means of its accounts with the Third Parties, or otherwise, and knew, or should have known, that the Websites' programming allowed the third-party cookies to be placed on users'—

- 106 -

CLASS ACTION COMPLAINT

including Plaintiffs'—browsers and devices and/or transmitted to the Third Parties along with users' Private Communications even after users clicked or selected the "Use necessary cookies only," "Strictly Necessary Cookies Only," and/or "Opt-Out All" buttons on the respective Websites to opt-out of or reject all such unnecessary cookies, which Defendants promised its users they could do. Defendants' misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiffs and Class members as to whether to use the Websites. In misleading Plaintiffs and Class members and not so informing them, Defendants breached their duty to Plaintiffs and Class members. Defendants also gained financially from, and as a result of, their breaches.

207.    Plaintiffs and Class members relied to their detriment on Defendants' misrepresentations and fraudulent omissions.

208.    Plaintiffs and Class members have suffered an injury-in-fact, including the loss of money and/or property, as a result of Defendants' unfair, deceptive, and/or unlawful practices, including the unauthorized interception of their Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, which have value as demonstrated by the use and sale of consumers' browsing activity, as alleged above. Plaintiffs and Class members have also suffered harm in the form of diminution of the value of their private and personally identifiable information and communications.

209.    Defendants' actions caused damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their personal information and communications.

210.    Defendants' representations that consumers could opt-out of or reject all unnecessary cookies including cookies used for targeted advertising and/or for providing analytical services) if they clicked or selected the "Use necessary cookies only," "Strictly Necessary Cookies Only," and/or "Opt-Out All" buttons on the respective Websites were untrue. Again, had Plaintiffs and Class members known these facts, they would not have used the

Websites. Moreover, Plaintiffs and Class members reviewed the popup cookie consent banner, and in the case of the Campbell's Website, the "Your Choices" tool, prior to their interactions with the Websites. Had Defendants disclosed that they caused third-party unnecessary cookies to be stored on Websites' visitors' devices that are related to personalization, advertising, analytics, and social media and/or share information with third parties even after they choose to opt-out of or reject all such unnecessary cookies, Plaintiffs and Class members would have noticed it and would not have interacted with the Websites.

211. By and through such fraud, deceit, misrepresentations and/or omissions, Defendants intended to induce Plaintiffs and Class members to alter their positions to their detriment. Specifically, Defendants fraudulently and deceptively induced Plaintiffs and Class members to, without limitation, use the Websites under the mistaken belief that Defendants would not permit third parties to obtain users' Private Communications when consumers chose to opt-out of or reject all unnecessary cookies. As a result, Plaintiffs and the Class provided more personal data than they would have otherwise.

212. Plaintiffs and Class members justifiably and reasonably relied on Defendants' misrepresentations and omissions, and, accordingly, were damaged by Defendants' conduct.

213. As a direct and proximate result of Defendants' misrepresentations and/or omissions, Plaintiffs and Class members have suffered damages, as alleged above, and are entitled to just compensation, including monetary damages.

214. Plaintiffs and Class members seek punitive damages because Defendants' actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' choice to opt-out of or reject the Websites' use of unnecessary cookies. Punitive damages are warranted to deter Defendants from engaging in future misconduct.

### Sixth Cause of Action: Unjust Enrichment

215. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

CLASS ACTION COMPLAINT

216.    Defendants created and implemented a scheme to increase their own profits through a pervasive pattern of false statements and fraudulent omissions.

217.    Defendants were unjustly enriched as a result of their wrongful conduct, including through their misrepresentation that users could opt-out of or reject all unnecessary cookies and by permitting the Third Parties to store and transmit cookies on Plaintiffs' and Class members' devices and browsers, which permitted the Third Parties to track and collect users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, even after Class members opted out of or rejected all such unnecessary cookies.

218.    Plaintiffs' and Class members' Private Communications have conferred an economic benefit on Defendants.

219.    Defendants have been unjustly enriched at the expense of Plaintiffs and Class members, and Defendants have unjustly retained the benefits of their unlawful and wrongful conduct.

220.    Defendants appreciated, recognized, and chose to accept the monetary benefits that Plaintiffs and Class members conferred onto Defendants at their detriment. These benefits were the expected result of Defendants acting in their pecuniary interest at the expense of Plaintiffs and Class members.

221.    It would be unjust for Defendants to retain the value of Plaintiffs' and Class members' property and any profits earned thereon.

222.    There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

223.    Plaintiffs and Class members are entitled to restitution of the benefits Defendants unjustly retained and/or any amounts necessary to return Plaintiffs and Class members to the position they occupied prior to having their Private Communications tracked and collected by the Third Parties.

CLASS ACTION COMPLAINT

224. Plaintiffs plead this claim separately, as well as in the alternative, to their other claims, as without such claims Plaintiffs would have no adequate legal remedy.

**PRAYER FOR RELIEF**

**WHEREFORE**, reserving all rights, Plaintiffs, on behalf of themselves and the Class members, respectfully request judgment against Defendants as follows:

A.   Certification of the proposed Class, including appointment of Plaintiffs' counsel as class counsel;

B.   An award of compensatory damages, including statutory damages where available, to Plaintiffs and Class members against Defendants for all damages sustained as a result of Defendants' wrongdoing, including both pre- and post-judgment interest thereon;

C.   An award of punitive damages;

D.   An award of nominal damages;

E.   An order for full restitution;

F.   An order requiring Defendants to disgorge revenues and profits wrongfully obtained;

G.   An order temporarily and permanently enjoining Defendants from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

H.   For reasonable attorneys' fees and the costs of suit incurred; and

I.   For such further relief as may be just and proper.

Dated: March 18, 2026

CLASS ACTION COMPLAINT

**GUTRIDE SAFIER LLP**

*/s/ Seth A. Safier*
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
  todd@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

*Attorneys for Plaintiffs*

CLASS ACTION COMPLAINT